458 So.2d 1260 (1984)
Mrs. Georgia Parker HAMPTON, Individually and as Natural Tutrix of Marge Lynette Hampton
v.
RUBICON CHEMICALS, INC., et al.
No. 83-C-2086.
Supreme Court of Louisiana.
April 2, 1984.
On Rehearing November 26, 1984.
Dissenting Opinion on Rehearing December 4, 1984.
Rehearing Denied January 4, 1985.
*1261 Victor L. Marcello, Talbot, Sotile, Carmcouhe, Marchand & Marcello, Donaldsonville, R. Bruce MacMurdo, Percy, MacMurdo & Eaton, Baton Rouge, for plaintiff-applicant.
Boris F. Navratil, Dorothy D. Thomas, Breazeale, Sachse & Wilson, Baton Rouge, for defendant-respondent.
BLANCHE, Justice.
Mack Hampton was employed by Barnard & Burk, Inc. as a maintenance laborer. On January 29, 1974, Hampton was working at the Rubicon Chemicals, Inc. plant in Geismar, Louisiana pursuant to a labor contract between Barnard & Burk and Rubicon. Hampton was one of several maintenance workers doing work on a three story plastics production rig known as the MDI unit. His duties involved the cleanout and repair of equipment on the MDI unit during a "turnaround."[1] At about 5:15 p.m., while Hampton and his co-workers were involved in cleaning up the area on and around the MDI unit after having performed their maintenance tasks, a phosgene gas leak occurred. Phosgene is a toxic gas used in the production of plastics. It is better known for its infamous use in World War I under the name "mustard gas". It has a delayed effect on the lung tissue. Hampton was exposed to the phosgene gas for an undetermined period of time of up to ten minutes. He and his co-workers were then taken to the first aid station within the Rubicon plant where they were administered oxygen and sent home with instructions to call Barnard & *1262 Burk's company physician, Dr. Fourrier, if they began to feel any ill effects.
James Perrin, Rubicon's foreman on the MDI unit, called each of the Barnard & Burk employees exposed to the phosgene gas every 3 hours to check on their condition. He called Mack Hampton's house twice before Hampton got home, leaving a message for Hampton to call him. When Hampton returned home at about 7:30 p.m., he returned Perrin's call and seemed to be in good health. He refused dinner however, and decided to take a bath. During his bath, Hampton began to cough and feel ill. At about 9:30 p.m., his wife, Georgia Parker Hampton, took him to the emergency room of Our Lady of the Lake Medical Center in Baton Rouge, accompanied by their 13 year old daughter, Marge Lynette Hampton. Hampton's condition rapidly worsened and he died at 2:25 a.m. on January 30, 1974, nine hours after breathing the phosgene gas.
Phosgene gas reacts with the lining of the lungs to disturb the enzyme system that controls the surface tension of the air within the lung. The mitochondria, elements in the cells of the lung tissue which utilize this enzyme system, are broken down resulting in an extremely high surface tension in the lung. As a result, fluid in the blood exudes into the alveoli, minute air vesicles in the lungs where oxygen exchanges take place, and produces pulmonary edema, commonly known as fluid in the lungs. In effect, a person literally drowns in his own fluids, much as a pneumonia victim. If this build up of fluids is not controlled, oxygen transfer cannot take place, resulting in death.
The lengthy procedural history of this action is important to our determination of the case and will be highlighted below.
On January 3, 1975, Mrs. Georgia Parker Hampton brought a wrongful death action both individually and as natural tutrix of her minor child, Marge Lynette Hampton, against Rubicon Chemicals, Rubicon's insurer Reliance Insurance Company, and Fireman's Fund Insurance Company alleging the negligence of Barnard & Burk and Rubicon through their management officials. Fireman's Fund filed an exception of no cause of action on the grounds that no individual tortfeasors had been named and that plaintiff's exclusive remedy against Barnard & Burk as a corporation was through worker's compensation. Over two years later, on May 13, 1977, plaintiff filed a supplemental and amended petition which added no defendants but which named certain supervisory officers of Barnard & Burk and alleged their negligence as grounds for a direct action against Fireman's Fund, Barnard & Burk's liability insurer. None of the named officers was ever served, nor were they ever made party defendants. As the accident in question occurred prior to the effective date of the 1976 revision to the Louisiana Worker's Compensation Act, plaintiff could have brought an executive officer tort action. A direct action against the officers' insurer was thus available at that time. See Canter v. Koehring, 283 So.2d 716 (La.1973).
On June 16, 1977, on plaintiff's motion, Rubicon and Reliance were dismissed from the suit pursuant to a settlement between plaintiff, Rubicon and Reliance wherein plaintiff expressly reserved her rights against Barnard & Burk, its officers and employees, and Fireman's Fund. This left Fireman's Fund as the sole named defendant in the case. On January 25, 1980, after almost five years, plaintiff answered Fireman's Fund's February 12, 1975 exception of no cause of action. The court overruled the exception on March 14, 1980. Fireman's Fund then filed an exception of prescription on June 9, 1980 which has never been ruled on.
On September 22, 1981, plaintiff filed a second supplemental and amended petition to add the names of additional supervisory officers of Barnard and Burk upon whose acts plaintiff based her action against Fireman's Fund. As with the previously named officers, none of these officers were served or made party defendants.
On January 29, 1982, a full eight years after the accident, plaintiff filed her first discovery motions in the form of interrogatories, *1263 requests for production of documents, and requests for admissions. In part, these discovery motions sought to determine from Fireman's Fund the nature of any contractual relationship between Barnard & Burk and Julian Dyason, Barnard & Burk's safety consultant, and whether Fireman's Fund provided any liability coverage for the acts of Julian Dyason.[2] Fireman's Fund answered these motions by denying that they provided any liability coverage for Julian Dyason and stating that they did not have any document which defined the contractual relationship between Dyason and Barnard & Burk. Plaintiff based her case on a claim that Barnard & Burk officers had been negligent in the safety training of their employees.
After plaintiff filed a third supplemental and amended petition to substitute Marge Lynette Hampton as a party plaintiff because she had reached the age of majority, the case went to trial before a jury on February 22-25, 1982. The jury rendered a verdict in favor of Fireman's Fund on February 25, 1982, and judgment in accordance with that verdict was signed on May 3, 1982.
The next day, counsel for plaintiff discovered that Fireman's Fund had settled a case in 1976, "Vince J. Cashio v. Julian Dyason & Assoc., Ltd., et al, No. 193,080, Div. `F', of the 19th Judicial District Court" (Cashio), wherein it was established that Barnard & Burk had contracted to indemnify Julian Dyason, Barnard & Burk's safety consultant, for expenses arising out of any suit against Dyason by a Barnard & Burk employee. Counsel for plaintiff also discovered that a claims adjuster for Fireman's Fund had attended a deposition of Dyason for the Cashio case wherein a 1972 letter forming the contract between Dyason and Barnard & Burk and defining the indemnity agreement was produced. The adjuster did not himself receive a copy of the letter. Further, the liability policy that Fireman's Fund issued to Barnard & Burk provided coverage for any contractual indemnification that Barnard & Burk might incur.
Based upon the above discoveries, counsel for plaintiff filed a motion for new trial based upon newly discovered evidence. La. C.C.P. art. 1972(2). This motion was denied on June 11, 1982. The First Circuit affirmed on June 28, 1983, 436 So.2d 1254 (La.App. 1st Cir.1983), and we granted writs on December 9, 1983, 442 So.2d 462 (La.1983).

Assignment of Error No. 1
Plaintiff contends that the trial court erred in denying her motion for new trial. *1264 Plaintiff contends that the trial strategy would have been completely different had the newly discovered evidence been made known to her prior to trial.
Plaintiff's argument appears to be on multiple grounds. First, had plaintiff known that Barnard & Burk had contracted to indemnify Julian Dyason, plaintiff would have named Dyason as a party defendant and proceeded directly against his heirs.[3] Second, if Fireman's Fund had been shown to be ultimately liable for Dyason's acts or omissions, what plaintiff perceived to be Fireman's Fund's main defense of putting the blame on Dyason could not have been used by Fireman's Fund. Plaintiff further contends that Fireman's Fund's inaccurate responses to discovery requests require a new trial in the interests of justice under La.C.C.P. art. 1973 based upon plaintiff's suggestion that Fireman's Fund's responses were inaccurate and possibly fraudulent, whether intentionally or not. For that reason, plaintiff contends that she should be awarded a new trial based upon the defendant's alleged bad faith in answers to discovery.
Initially, we must examine the requirements for the mandatory granting of a new trial. La.C.C.P. art. 1972 states:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
La.C.C.P. art. 1972(2) is the applicable provision to this inquiry. Under this provision, not all newly discovered evidence will support the granting of a new trial. The two requirements that the new evidence must meet are:
(1) The evidence must be important to the cause, and
(2) The evidence could not, with due diligence, have been obtained before or during trial. La.C.C.P. art. 1972(2); Barker v. Rust Engineering Company, 428 So.2d 391 (La.1983). Because we find that the second requirement was not met in this case, we must reject plaintiff's claim.
The cause of action on this suit arose on January 30, 1974 when Mack Hampton died from inhaling the phosgene gas. Suit was filed almost one year later on January 3, 1975. The first discovery attempted by plaintiff with respect to this suit occurred on January 29, 1982, eight years after the accident. The "newly discovered evidence" is the same evidence discovered by different counsel during a deposition in the Cashio case, supra, in 1976, only one year after suit in the case before us was filed. The counsel in the Cashio case obviously had no trouble discovering the allegedly critical correspondence defining the relationship between Dyason and Barnard & Burk. Yet counsel for plaintiff in the case before us failed to make any attempt to discover such a relationship until five and one half years after the Cashio discovery and over seven years after counsel filed the instant suit.
We have recently had occasion to examine the requirement of "due diligence" under La.C.C.P. art. 1972(2). In Barker v. Rust Engineering Company, 428 So.2d 391 (La.1983), we found that "[d]ue diligence does not require that a party do all that is possible to discover the evidence; it requires that a party do all that is reasonable to lead to the discovery of the evidence." 428 So.2d at 394. Had counsel for plaintiff been even remotely diligent in his discovery efforts, he would not have allowed over seven years to pass from the time he filed suit before he made his first *1265 attempt at discovery. Had counsel for plaintiff begun his discovery within even three years, Julian Dyason would have still been alive and available for deposition. Had counsel for plaintiff more reasonably begun his discovery within one year of filing this suit, he would surely have discovered the "newly discovered" evidence as easily as did the counsel in the Cashio case, supra. The record shows that in the seven years between the filing of the suit and plaintiff's first discovery attempts, Barnard & Burk had undergone a reorganization and had been sold once. During this reorganization and sale, several records were lost, abandoned, and/or destroyed. Additionally, Julian Dyason had died and Barnard & Burk had no access to Dyason's corporate files. Had plaintiff pursued discovery within a reasonable time from the filing of his suit, the sale and reorganization of Barnard & Burk and the death of Julian Dyason would not yet have occurred, thus the likelihood of plaintiff's discovery being successful would have been much higher, as evidenced by the success of the counsel in the Cashio case.
By waiting over seven years from the filing of suit to begin his discovery, counsel for plaintiff did not do all that was "reasonable to lead to the discovery of the evidence." 428 So.2d at 394. Reasonableness varies with the facts and circumstances of each case. In this case, there was no reason for counsel for plaintiff to wait such an inordinate amount of time before attempting discovery. Counsel for plaintiff has failed to meet the due diligence standard of La.C.C.P. art. 1972(2) as defined in Barker v. Rust Engineering Company, supra. As such, his motion for a new trial under La.C.C.P. art. 1972 was properly denied.
Plaintiff additionally contends that the motion for new trial should have been granted under the discretionary powers granted to the trial judge under La.C.C.P. art. 1973. That article provides:
A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.
Plaintiff contends that defendant's allegedly inaccurate responses to discovery constituted an "ill practice" on the part of the defendant, whether done intentionally or not. From our examination of the questions asked and the responses given, see footnote 2, supra, it appears that counsel for plaintiff asked the wrong questions, rather than defendant supplying inaccurate answers. Inquiries as to the relationship between Dyason and Barnard & Burk should more properly be directed to either Dyason or Barnard & Burk. Of course, as Dyason had died almost three years before counsel for plaintiff first attempted discovery, inquiries to Dyason at that time would have been impossible.
Be that as it may, our review shows that Fireman's Fund went to great efforts to locate the information requested by plaintiff. It must be remembered that plaintiff's requests came over seven and one-half years after the cause of action arose. Defendant was unable to locate, or even ascertain the existence of, the 1972 letter from Barnard & Burk to Julian Dyason delineating the relationship between the two.
Defendant's responses to plaintiff's inquiries as to whether Fireman's Fund provided liability coverage for Dyason were accurately answered in the negative. The only possible relationship between Dyason and Fireman's Fund is Fireman's Fund's coverage under the liability policy with Barnard & Burk to provide coverage for any contractual indemnity that Barnard & Burk might incur. This would amount to a possible indemnity claim by Dyason based upon his contract with Barnard & Burk which read in pertinent part:
Barnard and Burk, Inc. hereby agrees to defend or indemnify and hold harmless Julian Dyason & Associates against any and all expense which they might incur as a result of any suit brought against them by an employee of Barnard and Burk, Inc. as a result of the services being rendered under the terms of this agreement.
*1266 This is an indemnity relationship, not one of liability.
Plaintiff contends that defendant's responses to two of plaintiff's interrogatories, see footnote 2, parts (b) and (d), supra, were incorrect and misleading because a claims adjuster for defendant was present at the deposition of Julian Dyason in the Cashio case, supra, wherein the contract between Dyason and Barnard & Burk was produced. For this reason, plaintiff contends that defendant misled plaintiff by stating that Fireman's Fund did not possess any documents which recited the relationship between Dyason and Barnard & Burk. Our review shows that the claims adjuster for Fireman's Fund merely sat in on the Dyason deposition in the Cashio case, and that he took no active part in the deposition. Additionally, the adjuster was not provided a copy of the Dyason letter. As this deposition took place over five years prior to plaintiff's discovery attempts, it is not unreasonable that the claims adjuster might have forgotten the letter or failed to perceive its importance. As such, we find plaintiff's contentions that defendant's responses to discovery were misleading and constituted an "ill practice" to be without merit. The trial court properly denied plaintiff's motion for a new trial.

Assignment of Error No. 2
Plaintiff contends that the trial court's jury instruction regarding the standard by which an executive officer can be absolved of liability through delegation of authority was not an accurate statement of the law.
At trial, both parties stipulated that objections to jury charges would be made on the record after the jury had been charged and had retired for deliberation. By this stipulation, the parties waived the requirement of La.C.C.P. art. 1793 that such objections be lodged "before the jury retires to consider its verdict." They did not waive the other requirements of La.C.C.P. art. 1793. Article 1793 states, in pertinent part:

* * * * * *
C. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.
Although the parties had waived the requirement of bringing objections prior to the jury retiring for deliberations, they did not waive the requirement that they state specifically the matter to which they object and the grounds for their objection.[4] The record shows that the only objection to a jury instruction which did not also contain the grounds therefor, by either party, is the objection herein complained of. All other jury instruction objections, by both parties, included the grounds for the objections.
In the objection complained of, however, plaintiff merely made a general objection to the jury instruction as follows:
BY MR. B. MACMURDO: We object to the first jury charge of the defendant that you gave, that was defendant jury charge number one.
MR. MARCELLO: Is it going to be listed in the record as defendant jury charge number one; is that how it's going to appear in the record or can we just

*1267 BY MR. B. MACMURDO: The one that it is obvious that a corporation should the head of a corporation delegates his authority. All right. (Tr. p. 788).
Counsel, while specifying the matter to which he objected, stated no grounds for his objection on the record. Counsel for plaintiff contends that he gave oral reasons for his objection to the court's jury instruction at the jury charge conference held in chambers. While counsel for defendant denies this, we find it unnecessary to ferret out the truth to these respective claims. The Court must act only on what is contained in the record. La.C.C.P. art. 2164. Nowhere in this record is there any indication of any basis or grounds for plaintiff's objection.
Our jurisprudence has consistently held that an objection to the trial court's instructions to jurors, without assignment of any reasons whatsoever, does not comply with La.C.C.P. art. 1793. To preserve his right to appeal an erroneous jury instruction, a litigant must enter in the record the specific matter to which the objection is made and the grounds therefor. Bechtel v. Entringer Bakeries, Inc., 422 So.2d 1299 (La. App. 5th Cir.1982); Helaire v. Liberty Mutual Insurance Company, 397 So.2d 8 (La. App.3rd Cir.1981), writ denied 401 So.2d 975 (La.1981); Lea v. Baumann Surgical Supplies, Inc., 321 So.2d 844 (La.App. 1st Cir.1975), writ denied 325 So.2d 279 (La. 1976).
As plaintiff failed to preserve her right to appeal this issue by failing to state the grounds for her objection to the trial court's jury instruction on an executive officer's delegation of authority, the appellate court was correct in dismissing this assignment of error.
This assignment is without merit.

Assignment of Error No. 3
Plaintiff contends that the jury verdict is contrary to the law and evidence in that John Daniel, the vice president of Barnard & Burk with responsibility for employee safety, was shown to be negligent in his duty to provide safety training to employees.
It is well settled in our jurisprudence that the findings of fact by the jury or trial judge shall not be disturbed on appellate review unless, taking the entire record as a whole, they are clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, 283 So.2d 716 (La. 1973). In the instant case, the jury specifically found, as evidenced by their responses to special interrogatories, that John Daniel was not negligent. Our review of the record as a whole convinces us that this finding was not clearly wrong.
It was developed at trial that John Daniel was the executive officer with responsibility for employee safety at Barnard & Burk at the time of the accident. He was also charged with several administrative responsibilities including all of the general personnel and labor relations and activities. He was in charge of several divisions of this large corporation and had several special assignments, only one of which was employee safety. In his administration of employee safety, Daniel hired a safety consultant, Julian Dyason, to implement a safety program, make investigations, and supervise the employee safety program. In addition, Daniel directed his supervisors in the field, such as Dean Armstrong, Barnard & Burk's superintendent at the Rubicon plant at the time of the accident, to hold weekly safety meetings to discuss any safety problems that might arise in the field. Several Barnard & Burk employees in supervisory and foreman positions at the Rubicon plant at the time of the accident testified that weekly safety meetings took place and that there was a safety consultant who provided them with safety procedures.
Notwithstanding these ideal safety measures, plaintiff contends that John Daniel was shown to be negligent in providing safety for the employees because he did not provide adequate training for them in the dangers of, and the protection against, phosgene gas. At trial, Herman Shenk, the carpenter foreman for Barnard & Burk who was present on the MDI unit when the leak occurred, testified that when the *1268 alarm signifying a gas leak sounded, he knew that he and his workers were to get out of the area as quickly as possible. He stated that he lead the Barnard & Burk employees, including Mack Hampton, off of the unit, through the control room, and to the first aid station where they were given oxygen. Dean Armstrong testified that Rubicon supplied safety equipment and instructed Barnard & Burk employees on their use.
The workers on duty when the gas leak occurred were maintenance workers. Their job was to clean out the equipment on the MDI unit during each "turnaround". When the leak occurred, the Barnard & Burk employees were cleaning up the area after having performed the needed maintenance work on the unit. A Rubicon employee testified that there had never before been a phosgene leak during a turnaround and that the possibilities for such a leak were extremely remote because a turnaround required the entire unit to be "taken off line." This meant that no gasses or products were flowing through the unit. The unit was, in effect, disconnected from the production process. Before the Barnard & Burk employees were allowed to begin their work, they had to be given a safe-work permit by Rubicon which was issued only after all manufacturing processes had stopped and the production apparatus had been fully purged of any residual phosgene gas. Thus, the foreseeability of a phosgene gas leak while Barnard & Burk employees were on the MDI unit was extremely remote.
When presented with the above facts, the jury could reasonably conclude that John Daniel was not negligent in his administration of employee safety. The jury's finding is not clearly wrong. Arceneaux v. Domingue, supra.
Plaintiff further contends that John Daniel's duty to insure that an adequate safety program was implemented was a non-delegable duty because the workers were involved in an ultrahazardous activity. Plaintiff contends that the activity was ultrahazardous due to the toxic gas handled within the unit. What plaintiff fails to appreciate is the nature of the work being done by the Barnard & Burk employees and the environment in which they were required to work. As stated above, the Barnard & Burk employees were maintenance laborers who were not allowed onto the MDI unit until they received a safe-work permit. This safe-work permit would not be issued by Rubicon until after all manufacturing processes were stopped and the unit had been purged of any toxic gasses. Barnard & Burk, by contracting to provide labor to Rubicon for maintenance work was not engaged in an ultrahazardous activity. Rubicon, however, was engaged in an ultrahazardous activity in the storage and processing of toxic gasses. See Langlois v. Allied Chemical Corporation, 258 La.1067, 249 So.2d 133 (1971). It is not disputed by any party that Rubicon was at fault in causing the phosgene leak. Rubicon has admitted fault for the release of the gas and has entered into a settlement with plaintiff resulting in Rubicon and its insurer, Reliance Insurance Company, being dismissed from this suit. As Barnard & Burk was not engaged in any ultrahazardous activity, plaintiff's argument that John Daniel's duty to implement the safety program was non-delegable is without merit.
Thus, John Daniel properly discharged his own duties with regard to employee safety through his hiring of a qualified safety consultant and his delegation of authority to field supervisors to hold periodical safety meetings. The jury's finding that John Daniel was not negligent is not clearly wrong.
This assignment is without merit.

Assignment of Error No. 4
Plaintiff contends that the trial court erred in forcing plaintiff to call the alleged tortfeasor executive officers as plaintiff's witnesses on direct-examination rather than under cross-examination as allowed under La.C.C.P. art. 1634. Specifically, plaintiff contends that the trial court's ruling denying plaintiff's attempt to cross-examine Dennis Flurry under La.C.C.P. art. *1269 1634, prevented plaintiff from calling any of the alleged tortfeasor executive officers on cross-examination under La.C.C.P. art. 1634. We disagree.
La.C.C.P. art. 1634 states:
Any party or his representative may be called as a witness and cross-examined by the adverse party without the latter vouching for his credibility, or being precluded from impeaching his testimony, and immediately thereafter the witness thus called may be examined or cross-examined to the extent otherwise permitted by law upon the subject matter of his examination in chief by such adverse party. The court may permit the recall and further cross-examination of the party or of his representative as often as it deems such action to be in the interest of justice.
"Representative" as used in the paragraph above and in Article 1428(2) means an officer, agent or employee having supervision or knowledge of the matter in controversy, in whole or in part, whether or not he is in the employ of or connected with the party at the time his testimony is taken.
Dennis Flurry was employed by Barnard & Burk as a construction supervisor at the MDI unit prior to the accident, but was not employed by Barnard & Burk at the time of the accident. He rejoined Barnard & Burk in 1975 and was maintenance supervisor at the MDI unit at the time of trial. Plaintiff called Flurry under cross-examination in order to examine the regularity and content of any safety meetings that Barnard & Burk might have held while Flurry was under their employ. Defense counsel objected to the cross-examination on the grounds that Flurry was not an adverse party. Defense counsel argued that Fireman's Fund was the only defendant in the case and that Flurry, as Barnard & Burk's employee, did not fit the codal definition of "any party or his representative" as set forth in La.C.C.P. art. 1634.
The appellate court found that Flurry was the representative of an adverse party (Barnard & Burk), since dismissed, and as such was subject to being called on cross-examination under La.C.C.P. art. 1634. We disagree. Barnard & Burk was never made a party to this litigation. The only parties named as defendants in this action were Rubicon Chemicals, Inc. (since dismissed), Reliance Insurance Company (since dismissed), and Fireman's Fund Insurance Company. The suit against Fireman's Fund is a direct action, authorized by R.S. 22:655, against an insurer for the negligence of its insured, i.e. certain named executive and supervisory officers of Barnard & Burk.
It is clear that Flurry is not a "party" to this suit. He was not named as a defendant by the plaintiff. He is not even one of the alleged tortfeasor executive officers upon whose alleged negligent acts or omissions plaintiff bases her action against Fireman's Fund. Neither is Flurry a "representative" of any party to this action. He is not, and has never been, an officer, agent, or employee of Rubicon Chemicals, Inc., Reliance Insurance Company, or Fireman's Fund Insurance Company.
Any argument by plaintiff that Flurry is an employee of the company insured by Fireman's Fund, and in this way an "agent" or "representative" of Fireman's Fund is without merit. In a direct action against an insurer for the alleged wrongful acts of its insured, the insured is not a "representative" of the insurer. Soprano v. State Farm Mutual Automobile Insurance Company, 246 La.524, 165 So.2d 308 (La.1964).
As Flurry does not fall within the codal definition of "party" or "representative" for purposes of calling a witness under cross-examination under La.C.C.P. art. 1634, the trial court was correct to limit plaintiff's examination of Flurry to direct-examination only.
This assignment is without merit.

DECREE
For the reasons stated, the decision of the Court of Appeal, First Circuit, affirming *1270 the judgment of the trial court, is affirmed.
AFFIRMED.
DIXON, C.J., concurs with reasons.
LEMMON, J., dissents believing that plaintiffs have established entitlement to a new trial under La.C.C.P. 1972(2), but also subscribing to the statements in the concurring opinion by Chief Justice Dixon regarding La.C.C.P. Art. 1634.
DIXON, Chief Justice (concurring).
I respectfully concur.
The error complained of in Assignment of Error No. 4 was harmless. Nevertheless, I think the court should reconsider the holding in Soprano v. State Farm Mutual Automobile Insurance Co., 246 La.524, 165 So.2d 308 (1964), that an insured may not be called as an adverse witness under C.C.P. 1634 when the insured has not been made a party in a direct action against the insurer. The interests of the insured and the insurer are inseparable; the liability of the insurer depends on the liability of the insured. To show that the insured was negligent may well require a thorough cross-examination. Yet, in many cases, the insurer is not going to call the insured, and the plaintiff, under Soprano, may only call the insured on direct. The Soprano holding conflicts with much of the policy rationale behind the direct action statute.
Prior to 1975 and the adoption of the Federal Rules of Evidence, federal courts in diversity cases in Louisiana reached a different conclusion under Fed.R.Civ.Pro. 43(b) which was similar (if not more narrow) than C.C.P. 1634.[1] In Degelos v. Fidelity and Casualty Co., 313 F.2d 809 (5th Cir.1963), the Fifth Circuit faced the issue of whether an insured could be called as an adverse witness in a direct action suit where the insured was not a party. The district judge had not permitted the plaintiff to call the insured as an adverse witness. The court, finding the district court to be in error, stated: "It is plain that had [the insured] been sued as the sole defendant or joined with the insurers as a co-defendant, he would have been an adverse party within F.R.Civ.P. 43(b). His absencea matter of no significance under the Direct Action Statute as the controlling local substantive lawdid not change matters where the nominal plaintiff, as to all issues then for jury resolution, stood in his shoes. Since the plaintiff as a matter of right could call the assured in the one situation, he may equally as a matter of right do so when the suit is against the insurer alone." Id. at 815-16. Even after this court's holding in Soprano, the Fifth Circuit stuck to this rule, holding that it was procedural, not substantive. Hanover Insurance Co. v. Berry, 416 F.2d 279, 283 (5th Cir.1969).
C.C.P. 1634 does not directly address the issue posed in this situation, and its terms do not require the holding in Soprano. In an appropriate case, the court should reconsider and reverse the Soprano holding.

ON REHEARING
WATSON, Justice.
After Mack Hampton died from inhaling phosgene gas at Rubicon Chemicals' plant in Geismar, Louisiana, a nine to three jury verdict against his surviving wife and daughter was affirmed by the court of appeal. 436 So.2d 1254 (La.App. 1 Cir. 1983). A writ was granted, but the judgment was affirmed, chiefly because plaintiffs' *1271 attorney did not exercise "due diligence"[1] in discovery.[2] A rehearing was granted to consider whether a new trial should have been granted on the basis of evidence discovered after the trial.
Hampton was a maintenance employee of Barnard and Burk who was injured during a "turnaround" (Tr. 169) at the "MDI unit" (Tr. 169) of Rubicon when he was exposed to phosgene gas on January 29, 1974. The cause of action arose prior to the closing of the executive officer "loop hole" by Act 147 of 1976, and the jury was interrogated about the negligence of the various executive officers of Barnard and Burk. Under the "executive officer" jurisprudence, when a defendant executive breaches a duty of care owed to an employee through personal fault, the executive is liable for any resulting risk of harm. Canter v. Koehring Co., 283 So.2d 716 (La., 1973); Pisciotta v. Allstate Insurance Company, 385 So.2d 1176 (La., 1980); Lytell v. Hushfield, 408 So.2d 1344 (La., 1982); and Brown v. White, 430 So.2d 16 (La., 1982).
The rehearing application focuses primarily on the fault of John L. Daniel, Sr., a senior executive officer with Barnard and Burk, who testified that safety was under his administration at the time of this accident; he furnished safety services through the employment of Julian Dyason as a consultant. The jury made a factual finding that Daniel was an executive officer of Barnard and Burk. Fireman's Fund Insurance Company provided liability insurance coverage to Daniel under the policy issued to Barnard and Burk. The jury was charged that Daniel's delegation of his safety responsibility exonerated him and thus did not consider whether Daniel knew or should have known of the deficiencies in the Barnard and Burk safety program.[3] (Tr. 766) The jury was not interrogated about any negligence by Julian Dyason because plaintiffs' attorneys had been led to believe that Fireman's Fund Insurance Company, the only defendant at the time of trial, had no coverage for Dyason. Subsequent to the adverse jury verdict, plaintiffs' attorneys accidentally discovered that Fireman's Fund not only had indemnity coverage for any negligence or fault of Dyason under his contract with Barnard and Burk but had in fact settled a case involving that coverage in 1976. Plaintiffs argue that this coverage of Julian Dyason had been concealed by the discovery responses of Fireman's Fund Insurance Company.
In plaintiffs' supplemental petition filed May 13, 1977, it was alleged that "Julian Dyerson" was a negligent supervisor or executive officer of Barnard and Burk who was covered by the Fireman's Fund policy. This allegation was denied, except to admit that Fireman's Fund Insurance Company "was the liability insurer of Barnard and Burk, Inc." (Tr. 34)
Plaintiffs filed a request of production of documents on January 29, 1982, and asked defendant Fireman's Fund to produce the following:

*1272 "2. Correspondence concerning whether your company provided liability coverage for the following:
Julian Dyason ...
* * * * * *
"5. Any document that sets forth the terms of Julian Dyason's employment with and duties to Barnard & Burk, Inc." (Tr. 83)
In response to request number two, Fireman's Fund replied that it "has no correspondence concerning any liability coverages for the individuals identified in Request No. 2." (Tr. 85) As to request number five, Fireman's Fund answered that it "does not have possession or access to any documents such as identified in Request No. 5." (Tr. 85)
In answer to a request for admissions, Fireman's Fund Insurance Company stated:
"Neither Fireman's Fund Insurance Companies nor its attorneys has been able to find any written contract or correspondence between Julian Dyason and officials of Barnard and Burk, Inc." (Tr. 88-89)
In interrogatories, the insurance company was asked:
"Did you receive any correspondence from Barnard & Burk, Inc. or anyone else concerning whether you would provide liability coverage for the following people: Julian Dyason....
"If so, please indicate who has custody of the correspondence, the nature of the correspondence and whether Fireman's Fund agreed to provide coverage for the person." (Tr. 94)
The answer was "No". (Tr. 97)
Fireman's Fund was also asked:
"Have you had possession of any copies of contracts or correspondence between Barnard and Burk and Julian Dyason? If so, please indicate the nature of the documents and where they may now be found and in whose custody the documents are." (Tr. 95)
The answer again was "No". (Tr. 97)
In oral argument, defense counsel attempted to convince the jury that Dyason rather than Daniel was the only party at fault. It is clear that the only reason Julian Dyason was not named in the jury interrogatories is because plaintiffs' counsel concluded from discovery that Dyason was not covered by Fireman's Fund Insurance Company.[4] (Tr. 755) In connection with the motion for new trial, plaintiffs introduced the deposition of Julian Dyason in a suit entitled "Vince J. Cashio v. Julian Dyason & Associates, Ltd., Julian E. Dyason and Robert C. Brummel." In the deposition, Dyason identified a letter agreement he had with Barnard and Burk signed by John L. Daniel as senior vice-president and dated December 12, 1972. The agreement states:
"Barnard and Burk, Inc. hereby agrees to defend or indemnify and hold harmless Julian Dyason & Associates against any and all expense which they might incur as a result of any suit brought against them by an employee of Barnard and Burk, Inc. as a result of the services being rendered under the terms of this agreement."
Attending the Dyason deposition in the Cashio case was David R. Williams, who was the adjuster for Fireman's Fund Insurance Company in this case. The deposition was taken on October 9, 1976, a little over a year after this suit was filed by Mack Hampton's survivors. David R. Williams signed the settlement check in the Cashio suit on July 7, 1978, the insured being "Barnard and Burk Inc/Petro Corp."
*1273 After the Hampton trial concluded, Williams' deposition was taken on May 12, 1982. In Williams' opinion, there was no Fireman's Fund coverage on Julian Dyason. According to plaintiffs' attorney in the Cashio case: "our primary focus was on Mr. Dyason." (Proffer No. 1, page 16) Williams did not recall ever seeing the letter agreement Dyason had with Barnard and Burk. Although he was Fireman Fund's adjuster in this case, Williams also did not recall being asked about any contract or agreement between Dyason and Barnard and Burk in connection with plaintiffs' discovery. Williams said:
"My answer is that it's possible that Boris or Dorothy might have asked me about that, that is, with respect to Julian Dyason's relationship with us. But I do not at this moment remember whether they did or not. And if it did come up, I don't recall making any kind of search or extended inquiry into what records we might have had in respect to Julian Dyason. I don't recall that question coming up in this particular case in any manner before the trial of the case." (Depo., page 32)
* * * * * *
"Julian's status and his relationship with Barnard and Burk, the contractual relationship that he had or might have had with them and how that might have affected or been related to Fireman's Fund never at any time came up. And I had no reason whatsoever to make any investigation along those lines." (Depo., page 67)
Williams had no reference to Dyason in his Hampton file.
The statements on original hearing that: (1) Fireman's Fund Insurance Company "was unable to locate, or even ascertain the existence of, the 1972 letter from Barnard & Burk to Julian Dyason delineating the relationship between the two;" and (2) that "Fireman's Fund went to great efforts to locate the information requested by plaintiff," now appear erroneous.
Regardless of whether the misleading answers to plaintiffs' discovery were intentional or inadvertent, there is no indication that due diligence would have availed plaintiffs in discovering coverage on Dyason by Fireman's Fund Insurance Company. On the contrary, the information was discovered accidently. Further, regardless of any lack of diligence on the part of plaintiffs' counsel, a new trial is required in the interests of justice. LSA-C.C.P. art. 1973,[5]Lamb v. Lamb, 430 So.2d 51 (La., 1983). The evidence adduced at trial strongly suggests that the safety program of Barnard and Burk at the Rubicon facility was deficient in several respects and that this deficiency was attributable to Dyason and/or Daniel.
The original opinion concluded that a phosgene gas leak while Barnard and Burk's employees were working at the unit was "extremely remote". Joel Louque who was a production technician for Rubicon at the time of the accident and is now an inspector for the engineering department, testified to the contrary:
"We have phosgene releasesor back in that time, particular time we had them they occur when you have a turnaround because phosgene is suspended in solids and whatever and you do have a release from time to time." (Tr. 216)[6]
Dean Armstrong, Barnard and Burk's superintendent at Rubicon, admitted they "had had a number of phosgene releases with no problems."[7] He himself had been exposed to phosgene. Mary E. Bowen, the Rubicon registered nurse for fifteen years, had treated numerous Barnard and Burk employees for phosgene exposure. Her working day had ended when this accident occurred about 5:00 P.M. According to Rubicon's production manager, George Williams, *1274 this serious spill occurred during the course of a regular procedure for an unknown reason. There was expert testimony that the escape of the phosgene gas was foreseeable. Thus, the Barnard and Burk personnel worked at Rubicon's ultra-hazardous facility under the threat of phosgene gas poisoning. There is a strong implication that the maintenance Barnard and Burk contracted to perform for Rubicon was an ultra-hazardous activity. See Egan v. Hotel Grunewald Co., 129 La.163, 55 So. 750 (1911); Langlois v. Allied Chemical Corporation, 258 La.1067, 249 So.2d 133 (1971).
Under the contract between Rubicon and Barnard and Burk, the latter was responsible for furnishing its employees filters, respirators and safety equipment.[8] Plaintiffs' proffer number one, which the trial court refused to allow into evidence, is a citation to Barnard and Burk following this accident by the U.S. Department of Labor for violation of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651, et seq. (OSHA) in failing to provide respirators and prepare written procedures covering their use in dangerous atmospheres.
Herman Willie Schenk, the foreman for Barnard and Burk, had seven laborers and four carpenters in the unit with him. After the gas release which was "enough to knock you to your knees",[9] he and his crew went into the control room and subsequently to the first aid station. The crew left from the first aid station to go home. Schenk did not know that phosgene had a delayed effect; his only information was that it:
"[W]as dangerous; if you breathe it, it would cause a problem. It would cause a respiratory problem, or it would cause you to cough and would burn your eyes and so forth. That's about it." (Tr. 646)
Schenk went to the hospital the next morning. Afterward Schenk said:
"... if each one of us would have had an escape maskI'm talking about a portable escape maskand some way to get this thing on real fastif each individual would have had one, I feel sure that would have got out of there with no problem at all." (Tr. 643)
It is significant that all of the Rubicon employees who were present donned "Scott air packs"[10] and/or evacuated the area, thus avoiding injury. Barnard and Burk's workers knew nothing about the Scott air packs and took refuge in the control room, which was enclosed but not safe. They did not leave the floor of the control room until Louque came in and told them to get out. Louque estimated that ten minutes had elapsed before he told the Barnard and Burk men to leave the control room.
Two injured Barnard and Burk employees testified that they had no training in the safety procedures to be utilized in the event of a phosgene gas leak and knew nothing about phosgene. They did not know that Scott air packs were available for their use and were completely ignorant as to proper safety measures. The Barnard and Burk safety manual in use at the time of the accident had no information about the procedure to be followed in case of a phosgene gas leak. The Rubicon employees were trained in the use of the Scott air packs, but the Barnard and Burk employees were not. Seven of the Barnard and Burk employees were injured and one died, while none of the Rubicon employees were injured.[11] According to Louque, Rubicon had nothing to do with the safety training of the Barnard and Burk workers.
Stanley L. Day testified as an expert in the area of occupational and industrial safety that the accident resulted from the foreseeable escape of phosgene gas and failure to give the employees of Barnard and Burk safety training and provide them with protective respiratory equipment. In Day's expert opinion, Barnard and Burk's safety program did not meet the basic criteria of the National Safety Council.
*1275 Daniel admitted that he had a duty to install a safety program at Barnard and Burk but could find no documentation of any safety training given the employees which was pertinent to this accident. Having no educational background or training in safety, he relied completely on Dyason, who submitted a monthly report to him. Barnard and Burk had approximately five hundred maintenance employees in 1974, working in five to seven plants. Barnard and Burk also employed between one hundred and nine hundred construction workers. Daniel estimated that Dyason devoted fifteen to twenty hours a month to Barnard and Burk. According to Daniel, all special safety equipment, such as the Scott air masks, was to be furnished by Rubicon.
The evidence suggests strongly that Mack Hampton would have survived if he had been properly trained or had had proper safety equipment or had received prompt medical treatment immediately following his exposure to the phosgene gas, and the interests of justice require that a new trial be granted.
For the foregoing reasons, the opinion on original hearing is vacated. The judgment of the Court of Appeal is reversed and the matter is remanded for a new trial.
ORIGINAL OPINION VACATED; REVERSED AND REMANDED.
MARCUS, J., dissents.
BLANCHE, J., dissents and assigns reasons.
BLANCHE, Justice (dissenting).
The interest of justice is not served by permitting the plaintiff to try his case over some 10 years or more after the accident. Neither is the majority correct in stating that due diligence by counsel would not have discovered the indemnity agreement between Barnard & Burk and Julian Dyason. That assumption is dispelled by the fact that counsel discovered the agreement in another case only one year after plaintiff filed this suit. Had counsel for plaintiff more reasonably begun his discovery within even 3 years, Julian Dyason would still have been alive and available for deposition. In the 7 years between the filing of the suit and plaintiff's first discovery attempts, Barnard & Burk had undergone a reorganization and had been sold once. However, John Daniel of Barnard & Burk did testify concerning his efforts to locate correspondence in the files with Julian Dyason to the extent of offering counsel the opportunity to dig through records stored in their warehouse. Tr. 338, 339.
Why blame Fireman's Fund?
I respectfully dissent.
NOTES
[1] During a "turnaround", the entire unit is taken off line and all manufacturing processing is stopped on the unit. The purpose of a "turnaround" is to clean and repair the equipment and piping on the unit and to remove any built up solids from the reactors.
[2] The discovery requests and the responses complained of are as follows:

(a) In plaintiff's interrogatory number 3, plaintiff asked:
"Did you receive any correspondence from Barnard & Burk, Inc. or anyone else concerning whether you would provide liability coverage for the following people:
Julian Dyason
* * * * * *
Fireman's Fund answered, "No."
(b) In plaintiff's interrogatory number 5, plaintiff asked:
"Have you had possession of any copies of contracts or correspondence between Barnard & Burk and Julian Dyason? ..."
Fireman's Fund answered, "No."
(c) In plaintiff's requests for production number 2, plaintiff requested Fireman's Fund to produce all:
"Correspondence concerning whether your company provided liability coverage for the following:
Julian Dyason
* * *"
"... Fireman's Fund answered, "Defendant has no correspondence concerning any liability coverages for the individuals identified in Requisition No. 2."
(d) In plaintiff's requests for production number 5, plaintiff requested Fireman's Fund to produce:
"Any document that sets forth the terms of Julian Dyason's employment and the duties to Barnard & Burk, Inc."
Fireman's Fund answered, "Defendant does not have possession or access to any documents as identified in Request No. 5."
(e) In plaintiff's requests for admission number 3, plaintiff submitted:
"Neither Fireman's Fund Insurance Companies nor its attorneys have been able to find any written contract or correspondence between Julian Dyason and officials of Barnard & Burk, Inc."
Fireman's Fund answered, "Request number 3 is admitted."
[3] Julian Dyason had died on April 14, 1979. This was five years after the accident and almost three years before the case went to trial.
[4] Prior to the court charging the jury, the parties agreed only that the objections would be made after the jury was charged. They in no other way limited the effect of La.C.C.P. art. 1793.

MR. NAVATIL: Well, Judge, why don't you charge the jury and then we'll object to it?
MR. MACMURDO: That's correct.
THE COURT: Wait a minute. Ya'll can do it now.
MR. MACMURDO: Well, go ahead and charge them and then we'll object.
MR. NAVRATIL: The only thing we agree to is that you charge them, let them retire to deliberate, and then we object.
THE COURT: That's the only thing ya'll have agreed to. (Tr. p. 757). (emphasis added.)
[1] Fed.R.Civ.P. 43(b) provided:

"A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called maybe contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief."
Under the Federal Rules of Evidence the rule has been liberalized. Anyone, including a non-party, may be called as an adverse witness. See Fed.R.Evid. 607, 611(c) and the accompanying notes of the advisory committee.
[1] LSAC.C.P. art. 1972(2) provides:

"A new trial shall be granted, upon contradictory motion of any party, in the following cases:
* * * * * *
"(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial."
[2] Present counsel for plaintiffs enrolled as counsel of record on January 18, 1980, over five years after the initial lawsuit was filed. Footnote three of the original opinion points out that Julian Dyason, the subject of the discovery, had died on April 14, 1979.
[3] "4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm." Canter v. Koehring Company, 283 So.2d 716 at 721.
[4] It was stipulated by defense counsel at the new trial hearing that plaintiffs' counsel was "in the dark":

"... Fireman's Fund and counsel for Fireman's Fund were acutely aware of our problem, and I think, your honor, were acutely aware of the fact that we were in the dark with this matter....
"THE COURT: Is that what Mr. Macmurdo is going to testify to?
"MR. MARCELLO: That's what he would testify to.
"THE COURT: Are you willing to stipulate to that?
"MR. NAVATIL: Yes, sir." (Proffer No. 1, pp. 24-25)
[5] LSA-C.C.P. art. 1973 provides:

"A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law."
[6] Defendant's brief argues that Louque said there had never been a phosgene escape during prior "turn-arounds" (p. 21). Louque actually indicated there had never been a spill of this nature, i.e., this serious, which is in accord with the testimony quoted above. See Tr., p. 170.
[7] Transcript, page 617.
[8] P-5, Schedule A.
[9] Transcript, page 638.
[10] Transcript, pp. 177-178.
[11] Four of the Barnard and Burk employees remained hospitalized for nineteen days each.