Donald R. UPDIKE, et al.,

v.

**BROWNING–FERRIS, INC. and Conoco, Inc.**

Civ. A. No. 90–1591LC.

United States District Court, W.D. Louisiana, Lake Charles Division.

Oct. 8, 1992.

As Clarified by Minute Entry Oct. 27, 1992.

Walter Marshall Sanchez, Lorenzi & Sanchez, Lake Charles, LA, Harold A. Lawrence, Gallagher, Henchy, Guerriero & Lawrence, Baton Rouge, LA, for Donald R. Updike and Gladys Updike.

Walter Marshall Sanchez, Lorenzi & Sanchez, Lake Charles, LA, for Stanley and Rebecca Campbell.

Walter Marshall Sanchez, Lorenzi & Sanchez, Lake Charles, LA, for Thomas G. Helm, Deborah Helm, Norman W. Thomas and Laura A. Thomas.

James Berry St. John, Jr., Craig Wyman, Liskow & Lewis, Michael A. Chernekoff, Samuel O. Buckley, III, Judith V. Windhorst, Jones, Walker, New Orleans, LA, for defendant Browning–Ferris, Inc.

Thomas M. McNamara, Liskow & Lewis, Lafayette, LA, James Berry St. John, Jr., Craig Wyman, Liskow & Lewis, New Orleans, LA, for Conoco, Inc.

Leonard L. Kilgore, III, Kean, Miller, Baton Rouge, LA, Hunter W. Lundy, Lundy & Dwight, Lake Charles, LA, for Hercules, Inc. and Pittsburgh Plate Glass Co.

## JUDGMENT

TRIMBLE, District Judge.

For the reasons stated in the Report and Recommendation of the Magistrate Judge previously filed herein and after an independent review of the record including the objections filed therein, and a *de novo* determination of the issues, and having determined that the findings are correct under the applicable law;

IT IS ORDERED that Conoco, Inc.'s Fed. R.Civ.P. 12(b) Motion to Dismiss be and it is hereby DENIED.

THUS DONE AND SIGNED.

## MINUTE ENTRY

Upon request of counsel for Conoco, Inc. by letter attached hereto, and in order to make abundantly clear the effect the court's denial of Conoco, Inc.'s 12(b) motion to dismiss, the court hereby states that the ruling was made solely by application of the legal standards of review for 12(b) motions to the matters set forth in the motion, opposition thereto, and supporting memoranda. The court has made no findings of fact or conclusions law in connection with its ruling that would result in preclusion of a full evidentiary trial on the merits of any and all issues addressed in this lawsuit.

THUS DONE at Lake Charles, Louisiana on this 27th day of October, 1992.

## REPORT AND RECOMMENDATION

WILSON, United States Magistrate Judge.

Before the court is Conoco, Inc.'s (Conoco) Fed.R.Civ.P. 12(b) Motion to Dismiss. It has been referred to the undersigned Magistrate Judge for a Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1)(B).

Plaintiffs are seeking to recover under Louisiana tort law for damages they allegedly sustained as a result of pollution emanating from a hazardous waste disposal site near Carlyss. Plaintiffs allege that this pollution has resulted in a decrease in the value of their property. They also seek damages for mental distress and punitive damages. Conoco seeks a dismissal of the plaintiffs' claims against it "brought under LSA–C.C. art. 667." Summarized, Conoco's argument is that LSA–C.C. art. 667 pertains to a "proprietor" of a "estate" and that since Conoco is not a "proprietor" it cannot be held liable under art. 667. This court concludes that the complaint supports a claim for relief on a "possible theory" of relief and therefore, Conoco's motion should be denied.

In 1968, Conoco contracted with Nelson Industrial Services (NIS) to dispose of industrial waste from Conoco's Westlake plant. Pursuant to this contract NIS deposited Conoco's and other companies' waste in open pits or reservoirs at the Carlyss site. Browning–Ferris, Inc. (BFI) acquired NIS in 1971 and thereafter maintained the site.

In 1985, Conoco and BFI agreed with the Louisiana Department of Environmental Quality (LDEQ) to conduct a remedial investigation and feasibility study. The remedial investigation found that approximately 4 million gallons of industrial waste remained in the waste pits at the Carlyss site. Available waste receipts indicated that over 9 million gallons of waste had been received at the site from 1968 through 1972. (Exh. 33 attached to Judith Windhorst's Affidavit filed with Joint Motion for Summary Judgment on Claims for Punitive Damages (hereafter Windhorst Affidavit)). The remediation investigation also revealed organic contaminants had been released into the adjacent Olsen Bayou and into the ground water to depths of 120 feet. (Exh. 34 Windhorst Affidavit).

By 1987 it had been determined that a plume of shallow ground water contamination had spread to an area which included domestic water wells although the contamination was above the screened depths of the water wells. Conoco and BFI reported that computer modeling of the shallow ground water contamination off site indicated the possibility that contaminants might continue to spread. (Exh. 34 Windhorst Affidavit).

"The primary contaminants identified at the site were chlorinated hydrocarbons (such as 1, 2–dichloroethane and 1, 1, 2–trichloroethane.... Chlorinated hydrocarbons were detected in soil and ground water samples in the vicinity of the site and in bayou sediment samples adjacent to the site. A liquid chlorinated hydrocarbon (LCH) layer in the West pond and a chlorinated hydrocarbon sludge in both the East and West ponds were identified during the RI."[1] (Exh. 32 Windhorst Affidavit).

Based on this study the LDEQ determined that the "potential for the migration of substances from Pit No. 1 can and should be diminished by the removal of the waste contained in the East and West ponds." (See April 8, 1987 Order). The purpose for removing the waste from the disposal pits was to "eliminate the source of the continuing releases." After detailed evaluation it was determined that the hazardous sludge in the disposal pits would be incinerated. The LCH would be reprocessed with the unrecoverable portions being incinerated. (See Exh. 32 of Windhorst Affidavit). The LCH reclamation portion of the interim remedial action plan was completed in February of 1992. (Exh. 68 Windhorst Affidavit). As of March 9, 1992 the sludge removal phase had not begun. (Exh. 70 Windhorst Affidavit). Plans for long-term remediation of the site include cleanup of areas determined to be contaminated as a result of releases from the Carlyss site. (U.S. EPA letter dated October 26, 1987 Exh. 29 Windhorst Affidavit).

In 1988 over 100 Carlyss area residents filed lawsuits against the defendants alleging decreases in property values and other damages allegedly due to pollution from the Carlyss site.

1. For toxicological information regarding these substances (See Exh. 44 of Windhorst Affidavit).

## LAW AND ANALYSIS

".... In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 78 S.Ct. 99, 102 (1957).

"The question therefore is whether in the light most favorable to the plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief. The complaint should not be dismissed merely because plaintiff's allegations do not support the legal theory he intends to proceed on, since the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory." Wright & Miller, Federal Practice & Procedure: Civil 2d § 1357, pp. 332–37. *See also Rathborne v. Rathborne,* 683 F.2d 914, 917 n. 8 (5th Cir.1982).

Plaintiffs have alleged that:

1. Conoco contracted with NIS for the "placement and interim retention" of Conoco's industrial waste. (See Plaintiffs' petition ¶ 2);

2. BFI acquired NIS and assumed all of its obligations. (Plaintiffs' petition ¶ 3);

3. That pursuant to the contract with Conoco NIS placed Conoco's industrial waste in "reservoirs" located in the "immediate vicinity" of the plaintiffs' homes and property. (Plaintiffs' petition ¶ 4); and

4. That pollution of the "immediate environment," including plaintiffs' "immovable property," has resulted in damage to plaintiffs including decreased property values and mental anguish. (Plaintiffs' petition ¶¶ 5 & 6).

■ A principal is not generally vicariously liable for the acts of its independent contractor. However, a principal will be held responsible for the liability of an independent contractor arising out of "inherently dangerous" activities. *Olsen v. Shell Oil Co.,* 365 So.2d 1285 (La.1978); *Berger-*

on *v. Blake Drilling and Workover Co., Inc.,* 599 So.2d 827 (1st Cir.1992); *Ainsworth v. Shell Offshore, Inc.,* 829 F.2d 548 (5th Cir.1987), *cert denied* 485 U.S. 1034, 108 S.Ct. 1593, 99 L.Ed.2d 908 (1988); *O'Neal v. International Paper Co.,* 715 F.2d 199, 201 (5th Cir.1983); Keeton, *Prosser & Keeton on Torts,* 5th ed. § 71 (hereafter referred to as *Keeton* ). What constitutes an "inherently dangerous" activity is not altogether clear.

*Keeton* indicates that inherently dangerous activities are activities where "injurious consequences might be expected to result 'unless means are taken to prevent them' " or work "likely to be particularly dangerous 'unless special precautions are taken'." *Keeton* at p. 512. *See also Montgomery v. Gulf Refining Co.,* 168 La. 73, 121 So. 578, 580 (1929) ("... work that necessarily tends to expose others to danger, unless the work is carefully guarded.") and *Thompson v. PetroUnited Terminals, Inc.,* 536 So.2d 504, 512–13 (La.App. 1st Cir.1988) *cert. denied* 537 So.2d 212 (La. 1989) and 537 So.2d 213 (La.1989) ("... is inherently or intrinsically dangerous unless proper precautions are taken to avoid injury.... Propensities combined with the slightest human error or misjudgment culminate in disaster.") and *Bergeron v. Blake Drilling and Workover Co., Inc., supra* ("... even if ... perforating ... not ultrahazardous finding that ... is an inherently and intrinsically dangerous work is unavoidable.").

■ Absolute liability is imposed for damages caused by "ultrahazardous" activities. One requirement for an "ultrahazardous" activity is that the activity must have the potential for causing damage "even when conducted with the greatest prudence and care." *Ainsworth v. Shell Offshore, Inc., supra* at 550.

The foregoing authorities would ordinarily lead this court to believe that the standard for determining whether an activity is "inherently dangerous," (for purposes of determining the principal's responsibility for the fault of the independent contractor) is different from the standard used to de-

termine whether an action is "ultrahazardous" (for purposes of absolute liability). These authorities would seem to indicate that an "ultrahazardous activity" is a subset of activities that could be considered "inherently dangerous." *Keeton* at § 71 p. 513.

However, the weight of recent authority indicates that "ultrahazardous" activities and "inherently dangerous" activities do, in fact, share a common element—potential for damage despite "the greatest prudence and care." *Ainsworth v. Shell Offshore Inc., supra* at 549; *O'Neal v. International Paper Co., supra* at 201–02; *Bergeron v. Blake Drilling Workover Co., Inc., supra* at 1362; *Guillory v. Continental Oil Co.,* 521 So.2d 1220, 1224 (La.App. 3d Cir. 1988), *cert. denied* 526 So.2d 801 (La.1988). This court feels constrained to follow this line of authority.

A determination that the storage of industrial waste in open pits is an "ultrahazardous activity" would require dismissal of Conoco's motion regardless of whether Conoco could be considered a "proprietor" under LSA–C.C. art. 667. This is because such a determination would mean that the plaintiffs have stated a claim against BFI based on absolute liability and a claim against Conoco based on vicarious responsibility for the liability of its independent contractor, BFI (a successor to NIS). *Bergeron v. Blake Drilling and Workover, Inc., supra.*

■ In *Perkins v. F.I.E. Corp.,* 762 F.2d 1250 (5th Cir.1985), *reh. den. en banc Richman v. Charter Arms Corp.,* 768 F.2d 1350, the Fifth Circuit conducted a scholarly analysis of Louisiana law and determined that in order to constitute an ultrahazardous activity under Louisiana law the activity must satisfy the following three requirements:

1. It must relate to an immovable;

2. The activity itself must cause the injury and the defendant must engage directly in the activity; and

3. The activity must not require the substandard conduct of a third party to cause injury. 762 F.2d at 1267–68.

There would appear to be little question that the storage of hazardous industrial waste in open pits or ponds would satisfy the first two requirements. It is certainly an activity related to an immovable. Not only does it involve the storage of waste on an immovable in open pits and ponds, but one of the principal risks associated with this activity is the contamination and damage to adjoining streams and immovable property.

The alleged damages clearly result directly from the activity of storing hazardous waste. It is the escape of the hazardous waste into the soil, water and air that causes the damage just as it was the escape of toxic gas that caused the damages in *Langlois v. Allied Chemical Corp.,* 258 La. 1067, 249 So.2d 133 (1971). Just as certainly Conoco must be said to be engaged directly in the activity as the generator of the waste and the principal to the contract for its storage. The storage and disposal of its industrial waste is an integral part of Conoco's business. As noted above the law does not allow Conoco to insulate itself from liability by using an independent contractor. *Bergeron v. Blake Drilling and Workover Co., Inc., supra.*

■ Thus, the key to whether storage of industrial waste in open pits is an ultrahazardous activity is whether it meets the third requirement set out in *Perkins.* This element requires that the activity "can cause injury to others, even when conducted with the greatest prudence and care." *Triplette v. Exxon Corp.,* 554 So.2d 1361 (La.App. 1st Cir.1989). This court has found no clear explanation of precisely what is required to satisfy this third requirement. Clearly, if "substandard" conduct is required to cause the damage then the activity fails to satisfy this element. *Kent v. Gulf States Utilities Co.,* 418 So.2d 493, 499 (La.1982); *Perkins v. F.I.E. Corp., supra* at 1268. The "standard" by which "substandard" is judged is apparently the traditional standard of blameworthiness—reasonableness. What is "reasonable" depends upon a balancing of risk against the burden of precautions. *See*

*Levi v. S.W. LA. Elect. Membership Co-op.*, 542 So.2d 1081, 1086 (La.1989). It seems that no matter how the analysis is refined, in the end a policy decision is required. This requires consideration of factors that an "objective policy maker would advert to." *See Pitre v. Opelousas Gen. Hospital*, 530 So.2d 1151, 1161 (La.1988) and *Lebleu v. So. Silica of Louisiana*, 554 So.2d 852, 860 (La.App. 3d Cir.1989).

For example, the storage of toxic gas is clearly an ultrahazardous activity under Louisiana law. *Hampton v. Rubicon Chemicals, Inc.*, 458 So.2d 1260, 1268 (La. 1984); *Langlois v. Allied Chemical Corp.*, *supra*. If the burden of precautions was irrelevant the risk of leaks of toxic gas could, no doubt, be eliminated. Failsafe systems with multiple backups could virtually guarantee that there would be no leaks. However, the burden of constructing every manufacturing plant that uses toxic gas like a nuclear power plant or like a space capsule outweighs the risk—such precautions are not "reasonable." When such a plant is constructed with "reasonable" precautions there is still a significant risk of leaks and damage may result even though there is no "substandard" conduct.

■ Whether or not an activity is "ultrahazardous" is a question of law. *Perkins v. F.I.E. Corp.*, *supra* at 1266; *O'Neal v. International Paper Co.*, *supra* at 201; *Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, 678 F.2d 1293, 1308 (5th Cir.1982); *Touchstone v. G.B.Q. Corp.*, 596 F.Supp. 805, 814 (E.D.La.1984). The determination of whether an activity can cause injury despite great prudence and care seems to require a factual inquiry. Yet, many decisions addressing the issue have not turned on evidence presented by the parties. *See Touchstone v. G.B.Q. Corp.*, *supra* at 815. Thus, the court may be required to decide the issue on other grounds such as analogy to other activities previously held to be either ultrahazardous or not. *Id.* at 815. There is also authority to support the court's use of factual evidence in deciding whether an activity is ultrahazardous, at least where the issue has not been settled

previously. *See Lebleu v. Southern Silica of Louisiana, supra* at 860.

Regardless of which course this court takes it reaches the same result—Conoco's motion must be denied. If it is appropriate to consider factual evidence presented by the parties, it would not be appropriate to grant a Rule 12(b) motion dismissing plaintiffs' claims as a matter of law. The parties should at least have the opportunity to more fully develop the record with summary judgment evidence.

On the other hand, if the determination of whether the storage of hazardous waste in pits is an ultrahazardous activity is not based on an evidentiary record, this court would conclude that such an activity is "ultrahazardous." The storage of hazardous waste in open pits is most easily analogized to those activities which have been found to be ultrahazardous.

Absolute liability for ultrahazardous activities clearly finds its roots in arts. 667–669 of the Louisiana Civil Code. *Perkins v. F.I.E. Corp., supra* at 1266. In discussing art. 667, Professor Yiannopoulos states:

[C]ases properly anchoring responsibility on this article either involve damage caused through fault or damage caused by constructions, *by escaping dangerous substances, such as dammed water or sewerage,* and by ultrahazardous activities such as dynamite blasting, spraying noxious chemicals, and pile driving operations by heavy equipment. *No case has been found in which a landowner or other person was held liable under art. 667 for non-negligent acts and activities that were not ultrahazardous."* A. Yiannopoulos, Predial Servitudes 4 La.Civil Law Treatise, § 50 at 139–40 (1983) (emphasis supplied). (quoted with approval in *State by DOT & Dev. v. Chambers Investment Co.*, 595 So.2d 598 (La.1992)).

The storage of toxic gases is, without doubt, an ultrahazardous activity. This court is unable to find a logical distinction between activities such as damming water, sewerage disposal and the storage of toxic gases on one hand and the storage of hazardous waste in open pits on the other that

would explain why the former are ultrahazardous while the latter is not.

As noted previously, ultimately whether an activity is considered ultrahazardous is a policy decision. This requires consideration of factors that an "objective policy maker would advert to formulating a rule to govern the case," such as moral, social and economic values. *Pitre v. Opelousas General Hospital, supra* at 1161. In this regard the court is aided greatly by legislation recently enacted addressing the storage and disposal of hazardous waste. This legislation reflects the results of closely related policy considerations by Louisiana's principal policy maker—the legislature. LSA–R.S. 30:2193 states in part:

"A. It is the determination of the legislature that Louisiana is particularly ill-suited both hydrologically and climatically to hazardous waste land disposal methods and past *land disposal methods, siting criteria, and maintenance procedures have, despite the degree of stringency, been inadequate to insure the health of the citizens of the state and in maintaining the integrity of the environment generally* and water resources specifically. It is further determined that eventual releases of hazardous constituents from land disposal facilities are highly probable if land disposal

methods continue to be relied upon and that there presently exists alternatives which may be used to destroy, reduce, or lessen the toxicity of or lessen the leaching potential of hazardous wastes. In order to preclude further environmental damage and endangerment to the citizens of the state, it is the purpose of this Section to provide for restrictions and incentives designed to encourage alternative methods of hazardous waste disposal, destruction, and reduction; to lessen the possibility of hazardous waste releases from existing land disposal sites; and to provide for the eventual prohibition of land disposal of hazardous waste." (emphasis supplied) [2]

If called upon to decide the issue on the record as it now stands the findings by Louisiana's legislature and analogy to other activities previously determined to be ultrahazardous would lead this court to conclude that the storage of hazardous waste in pits is an ultrahazardous activity. The case of *Ewell v. Petro Processors of Louisiana, Inc.,* 364 So.2d 604 (La.App. 1st Cir.1978) *cert. den.* 366 So.2d 575 (La.1979) does not compel a different conclusion. In *Ewell* the First Circuit did not impose absolute liability on the generators of chlorinated hydrocarbons which were stored in pits

**2.** Also significant are the legislative findings and statements of purpose set forth in some of this environmental legislation.

"A. The legislature finds and declares that the handling, storage, and disposal of hazardous and solid waste is posing an ever increasing economic burden and environmental risk to the citizens of this state; that the past efforts taken by the state and federal government to control pollution from waste after such waste has been generated have often resulted in wastes being transferred from one medium to another; that generation of certain amounts of waste can accumulate to environmentally unacceptable levels when post-pollution controlled discharges from many generators enter the environment; that waste management and treatment activities are and can be beneficial, but that all waste treatment and recycling facilities pose some environmental risk and thus require effective regulation, and that the most certain means of preventing environmental risk is through waste reduction; that waste reduction may be used as a tool to improve industrial efficiency, growth, and international competitiveness;

and that establishing a comprehensive, omnimedia approach to reducing wastes going into the air, land, and water is essential." LSA–R.S. 30:2292.

"(1) Hazardous wastes in inactive or abandoned pits, ponds, lagoons, landfills, or other pollution sources pose a present and future hazard to the public health, safety, and welfare." LSA–R.S. 30:2222 A.

"(1) Hazardous chemicals and substances have been disposed of in Louisiana for many years in a manner that, although possibly legal at the time, was careless and inappropriate and created conditions which are extremely dangerous and may cause long-term health and environmental problems for the people of this state.

(2) Hazardous substances are produced and transported on a regular basis around this state and there have been numerous recent discharges resulting from accidents which have caused extensive damage to the citizens of the state and have caused the state to expend large sums to respond to these incidents." LSA–R.S. 30:2271 A.

and which contaminated much of 550 acres of swampland. The court stated:

"The record in this case does not support the conclusion that the work done by Petro Processors can not be done safely. The damages suffered by plaintiffs were due, not to the dumping of toxic substances in the pit, but to the improper construction of one of those pits." 364 So.2d at 607.

The court's simple statement that the record will before it in that case did not support a conclusion that the storage of hazardous waste was ultrahazardous is not very persuasive support for a conclusion that such an activity is not ultrahazardous as a matter of law. This is particularly true in view of the apparent conflict with the subsequent legislative determination reflected in R.S. 30:2193. Since the court did not discuss how it reached this conclusion in any detail it is impossible to determine how adequately developed the record was relative to the hazardous nature of the activity.

For all of the above reasons this court concludes that the allegations of plaintiffs' complaint support a claim for relief. Accordingly, it is recommended that Conoco's Rule 12(b) motion to dismiss be denied.

Under the provisions of 28 U.S.C. 636(b)(1)(C) the parties have ten (10) business days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE WILL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDS ON APPEAL.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 28th day of July, 1992.