753 So.2d 269 (1999)
MOSSY MOTORS, INC., Roy J. Mossy, Mary Lou Christovich and Lyons-New Orleans, Inc.
v.
The SEWERAGE AND WATER BOARD OF the CITY OF NEW ORLEANS, Pepper and Associates, Inc., C.R. Pittman Construction, et al.
No. 98-CA-0495.
Court of Appeal of Louisiana, Fourth Circuit.
May 12, 1999.
Writ Denied October 29, 1999.
*272 Miles P. Clements, Kenneth A. Mayeaux, Michael R. Phillips, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, Louisiana, Attorneys for Plaintiffs/Appellants.
Ira J. Rosenzweig, C. Theodore Alpaugh, T. Gavin Hoppe, Smith Martin, New Orleans, Louisiana, Attorneys for Defendant/Appellant.
Robert I. Siegel, William M. Blackstone, Hoffman, Siegel, Seydel, Bienvenu & Centola (APLC), New Orleans, Louisiana, Attorneys for Defendant/Appellant.
Court composed of Judge ROBERT J. KLEES and Judge MOON LANDRIEU and Judge JAMES F. McKAY, III.
JAMES F. McKAY, III, Judge.
The defendant, Sewerage and Water Board of the City Of New Orleans, appeals a judgment in favor of Mossy Motors Inc., after a bifurcated trial on the merits in April of 1997. According to the law, "[n]o suit against a political subdivision of the state shall be tried by a jury." La. R.S. 13:5105. Therefore, the trial of this matter was bifurcated with the liability of the Sewerage and Water Board determined by the trial judge while the issue of the other defendants, Pittman Construction Company and Pepper and Associates, was determined by a jury.

STANDARD OF REVIEW
In the instant case the judge and jury came to different conclusions on the issues of liability and damages. The jury verdict and the trial court's judgment against the state entity, the Sewerage and Water Board, are irreconcilable and should be reviewed de novo. The trial court found the Sewerage and Water Board liable on a theory of strict liability, because its actions resulted in inverse condemnation (a constitutional/constructive taking). The trial court also dismissed the mental anguish claim of Roy Mossy Sr. Conversely, the jury allocated fault among all three of the defendants and accepted the mental anguish claim of Roy Mossy Sr., and awarded him damages.
In a bifurcated trial, where the judge and jury come to different conclusions on the issues of liability and damages, the appellate court must make an independent review of the record... without according any weight to the conclusions of either the jury or the trial judge. Carr v. City of New Orleans, 626 So.2d 374, 376 (La.App. 4 Cir.1993) Writ denied, 94-0062 (La.3/11/94), 634 So.2d 398. This Court's rule mandating an independent review in this case derives from the Louisiana Supreme Court's decision in Thornton v. Moran, 343 So.2d 1065 (La.1977). In that case the Louisiana Supreme Court reviewed the decision by the First Circuit affirming inconsistent conclusions of the *273 judge and jury. The Supreme Court reversed the appellate court and remanded it back to the court of appeal "to resolve the differences in the factual findings between the jury and the judge in these consolidated cases and to render a single opinion based upon the record." Id. at 1065. Accordingly, we review this matter de novo.

PROCEDURAL HISTORY
When reviewing the judgments of the trial court and the jury verdict we analyze each finding on its own.
The jury found Pepper and Associates, Pittman and the Sewerage Water Board negligent in causing property damage and business related interruption at Mossy Motors. The jury apportioned fault at fifty percent (50%) to Pepper and Associates, forty percent (40%) to the Sewerage and Water Board, and ten percent (10%) to Pittman Construction. The jury determined that four million dollars ($4,000,000.00) would compensate Mossy Motors for these damages. The jury also found Pepper and Associates and the Sewerage and Water Board were negligent in causing unreasonable delay during the construction. The jury awarded one million dollars for this item of damage and apportioned fault thirty percent (30%) to Pepper and Associates and seventy percent (70%) to the Sewerage and Water Board. Additionally, the jury found Pepper and Associates forty-five percent (45%) at fault, Pittman Construction ten percent (10%) at fault and the Sewerage and Water Board forty five percent (45%) at fault for the negligence on the claim of mental anguish by Roy Mossy, and awarded him two hundred and fifty thousand dollars ($250,000.00).
On June 17, 1997, the trial court signed a written judgment confirming the jury award against Pepper and Associates, Pittman Construction, and their respective insurers. This judgment is now moot due to the dismissal of the appeal against all other defendants except the Sewerage and Water Board.
Also on June 17, 1997, the trial court rendered its judgment along with written reasons against the Sewerage and Water Board. The trial court found the Sewerage and Water Board liable for damages in the amount of three million two hundred and forty-seven thousand seven hundred and nineteen dollars ($3,247,719.00). The trial court based this award on two million forty-seven thousand and seven hundred and nineteen dollars ($2,047,719.00) for out-of-pocket expenses due to construction plus one million two hundred thousand ($1,200,000.00) for damage to Mossy Motor's service building. The court also found Sewerage and Water Board liable for one million dollars ($1,000,000.00) for financial harm or business interruption to the dealership totaling four million two hundred forty-seven thousand seven hundred and nineteen dollars ($4,247,719.00). Further, the Trial Court dismissed Roy Mossy's claim for mental anguish, without reason. Finally, the trial court dismissed the cross claim of the Sewerage and Water Board against Pepper and Associates and Pittman Construction.

FACTS
The Sewerage and Water Board entered into a contract, in accordance with the Louisiana Public Bid Law, with C.R. Pittman Construction Company, as a contractor, and Pepper and Associates, Inc., as an engineer, to perform certain design improvements to drainage Pumping Station # 1 located on South Broad Street in New Orleans. The plaintiffs automobile dealership was located near the construction site on South Broad Street. The damages took place during Phase II of the project, which consisted of demolition, and replacement of an underground concrete structure adjacent to Pumping Station No. 1 known as the "suction basin."
The Board knew as early as 1975 that there was a contamination problem with the construction site but failed to act. Previously, there had been a city-owned gasoline/service station on the site adjacent *274 to the Mossy property and construction site. The soil there was contaminated with gasoline. Consequently, the entire project was impeded in order to comply with environmental regulations. The problem was that the project had already begun and its intrusive effects were only perpetuated by this dilatory action by the Sewerage and Water Board.
Additional delays occurred during the construction. In order to demolish and replace the underground suction basin, an earth retaining wall was constructed to encircle the suction basin and form a barrier against the surrounding earth. This wall was generally referred to as a temporary earth restraining structure (TERS) or a cofferdam, which Pittman Construction Company was responsible for designing and Pepper and Associates was responsible for constructing. Because of numerous adjustments made to the design, there developed an inordinate amount of delay. This further impacted the plaintiffs business, not the least of which was the economic loss of business.
There was also damage caused to the plaintiffs buildings because of the nature of the construction. In particular "dewatering" or "deep well pumping," a process involving pumping out underground water from the construction site, lowered the water table in the area causing settlement or subsidence of the ground resulting in structural damage and creating a safety hazard to the surrounding buildings of Mossy Motors. A report acquired by the Board from Eustis Engineering Co., a soil consultant, warned that the dewatering process could cause such damages to the adjacent property.
The showroom and offices were ultimately condemned on March 14, 1996, by the Department of Safety and Permits as being a "public nuisance," thereby forcing the business to be moved into trailers. Albeit there had been some sinkage prior to the construction, the sinkage escalated after the construction began. Doors would not close and cracks appeared in the walls and floors, creating more than a mere inconvenience to the plaintiff.
Mossy encountered further problems due to changes in the building code and the building requirements of General Motors Corp., which held the right of approval of any new construction. Consequently, the former structures were replaced with several smaller buildings as dictated by General Motors. The new construction provided the same square footage at a cost comparable to a literal restoration of the former building. Replication was impossible. It would have been impossible to replicate the prior structures to pre-construction conditions without a total restoration and rebuilding of the entire complex due to the change in building codes and requirements of General Motors.
It was the Sewerage and Water Board's decision to use the dewatering method, despite less dangerous methods being available and the advice from several experts who apprised them of the likely consequences. The manner in which it handled the removal of contaminated soil on nearby property owned by the City of New Orleans was imprudent, impracticable and dilatory. This decontamination process resulted in delays in the project further impacting plaintiffs damages.

STRICT LIABILITY
We find the defendant liable to the plaintiff under a theory of strict liability pursuant to La.C.C. art. 667. The doctrine of "sic utere tuum ut alienum non laedas" requires an owner to use his property in such a manner as not to injure another. Haworth v. L'Hoste, 95-0714 (La.App. 4 Cir. 11/30/95), 664 So.2d 1335, writ denied, 96-0408 (La.3/29/96), 670 So.2d 1235. Pursuant to La. C.C. art. 667:
Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
*275 Any activity, which causes damage to a neighbor's property, obliges the actor to repair the damage, even though his actions are prudent by usual standards. It is not the manner in which the activity is carried on which is significant; it is the fact that the activity causes damage to a neighbor, which is relevant. Lombard v. Sewerage & Water Board of New Orleans, 284 So.2d 905 (La.1973).
The defendant applies La. C.C art 668 to the instant case. The article states that one is not at liberty to make any work by which his neighbor's building may be damaged; however, one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor. We must determine whether the State's construction activity resulted in inconveniences that must be tolerated by the claimant under Article 668 or, rather, resulted in more serious inconveniences or interference that may be actionable under Article 667.
In Reymond v. State Through Dept. of Highways, 231 So.2d 375, 384, 255 La. 425 (1970), the court found that damages which cause discomfort, disturbance, inconvenience, and even some financial loss as ordinary and general consequence of public improvements are not compensable, and are considered "damnum absque injuria" (loss without injury in the legal sense). Reymond involved the construction of an elevated highway, which denied the plaintiff an easy access to her home, obstructed her view, and caused her to suffer the noise from heavy traffic. Other homes in the area were expropriated by the state for the project, but the plaintiff's home was not. The Court held that the plaintiff could not recover for diminution in value caused by impaired accessibility, discomfort, and disturbance, but that she could recover for diminution in market value of her residence by reason of structural damages attributable to vibration from piledriving activity during the highway construction.
The Louisiana Supreme Court, in an unbroken line of precedent, has held that no showing of negligence is required to prevail on a claim for damages under Civil Code article 667, see, e.g. O'Neal v. Southern Carbon Co., 211 La. 1075, 1077, 31 So.2d 216 (1947); Craig v. Montelepre Realty Co., 252 La. 502, 211 So.2d 627, 631-32 (1968); Chaney v. Travelers Insurance Co., 259 La. 1, 16, 249 So.2d 181, 186 (1971); Hero Lands v. Texaco, 310 So.2d 93, 97 (La.1975); Butler v. Baber, 529 So.2d 374, 381 (La.1988); Lombard v. Sewerage & Water Board of New Orleans, 284 So.2d 905, 912 (La.1973). In Lombard, a case with facts similar to the instant case, the Louisiana Supreme Court praised the Board and its contractors for completing the project in a competent, workmanlike manner. Id. at 908. Nonetheless, the Louisiana Supreme Court held under Article 667 the Board would be liable for damages to the plaintiff's property caused by its construction activities, no matter how prudently they were done. Id. at 912. Applying these precepts to the evidence, we conclude that there has been a taking and damage to the plaintiff's property under Article 667. This amounts to more than the mere inconvenience to be tolerated under Article 668. Moreover, the Board, as proprietor, is responsible not only for its own activity, but also for that carried on by its agents, contractors and representatives with its consent and permission. See, Id.
This matter arose prior to the amendment of La. C.C.art 667.[1] We agree with the trial court that the pre-amendment law applies to the case at bar. Prior to the amendment to article 667, it was clearly within the discretion of the trial court to decide whether the dewatering *276 technique was an ultrahazardous activity. "The activity to be deemed `ultrahazardous' activity must be one that can cause injury to others, even when conducted with the greatest prudence and care." Updike v. Browning-Ferris Inc., 808 F.Supp. 538 (W.D.La.1992). The new definition by amendment defines an ultrahazardous activity legislatively, but, under the pre-amendment law, it was an easy leap between pile driving, explosives and dewatering. In the instant case other less hazardous methods were available, but not chosen by the Board. As a result of the defendant choosing this ultrahazardous mode of operation to remove subterraneous water, the plaintiff suffered severe damage to both his business and building structures. Therefore, we find that the Sewerage and Water Board is strictly liable to the plaintiffs for the damages sustained. Accordingly, we are in agreement with the judgment and reasoning of the trial court on the issue of strict liability.

INVERSE CONDEMNATION
Inverse condemnation is the taking of an owner's property by a State entity absent an expropriation resulting in a constitutional taking. The Declaration of the Right to Property in the 1974 Louisiana Constitution provides:
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivision except for public purposes and with just compensation paid to the owner or into court for his benefit.... In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss.
La. Const. Article I, § 4.
When attempting to analyze if the issue includes a public purpose we gain some insight into the theory of eminent domain from Reymond, supra. "Since a taking or damaging to property may in fact occur without expropriation proceedings by a public body through oversight or lack of foresight, there must be some proceedings whereby an owner may seek redress when his property is taken without the proper exercise of eminent domain. Such an action is often referred to as `inverse condemnation'." Thus, our Constitution does not simply require that the owner of condemned or damaged property be compensated with the market value of the property taken and severance damage to the remainder, but that he be "compensated to the full extent of his loss" and "placed in as good a position, pecuniary as [he] enjoyed prior to the taking." State Through Dept. of Highways v. Bitterwolf, 415 So.2d 196, 199 (La.1982). Furthermore, the action for inverse condemnation is available in all cases where there has been a taking or damaging of property, where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal. La. Const. of 1974, Art. I § 4; see also Ursin v. New Orleans Aviation Board, 506 So.2d 947, 955 (La.App. 5th Cir.1987), judgment reversed, 515 So.2d 1087 (La.1987).
In Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993), the church sued the gas company for damages arising out of a fire in an apartment complex owned by the church. The district court found for the church and limited its recovery to the amount expended to restore the building to its prefire condition reduced by depreciation. An appeal was taken to the Louisiana Fifth Circuit Court of Appeal where the district court ruling was affirmed. On certiorari, the Louisiana Supreme Court held that the church was entitled to recover the full cost of restoring the building not just replacement cost less depreciation.
*277 One injured through the fault of another is entitled to full indemnification for damages caused thereby. Coleman v. Victor, 326 So.2d 344 (La.1976). In such a case, "[t]he obligation of the defendant... is to indemnify the plaintiff... to put him in a position that he would have occupied if the injury complained of had not been inflicted. Consequently, when property is damaged through the legal fault of another, the primary objective is to restore the property as nearly as possible to the state it was in immediately preceding the damage." Id. at 346.
Professor Walter Blessy, a civil engineer, testified as an expert in foundation engineering for the plaintiffs. Professor Blessy testified that the Mossy building was in equilibrium for some years. He explained that when a building in equilibrium for some years shifts, it usually occurs because of construction activities. Blessy opined that the soils at the Mossy site are susceptible to settlement and these soils would be affected by dewatering process. He also found 4½ inches of settlement from 1994 to 1996 in the front slab of the Mossy building and that from 1945 through 1993 the building had experienced a settlement of only 1½ inches.
Additionally, Blessy testified that there was a drawdown under the Mossy property in the spring of 1994. He described the condition under which ground water was being reduced under the Mossy building during that period. In his opinion the dewatering operation caused the settlement. He conveyed that there was absolutely no doubt in his mind that the dewatering caused the settlement experienced by Mossy.
On cross-examination, Professor Blessy was questioned regarding pre-construction photographs. He acknowledged that there was probably some settlement. But, again he reiterated that the building had been in equilibrium for approximately twenty years. He did not believe that the cracks, visible in the pre-construction photographs, threatened the life or the stability of the building, nor did he believe these cracks were significant. Blessy was also questioned about the renovations to the Mossy building in 1977. He explained that from 1977 through 1994, the settlement did not exceed 1¼ inches.
Walter Sherman, a geotechnical engineer was also called as an expert witness for the plaintiffs. He testified that when the ground water was drawn down at the pumping station, it was simultaneously drawn down on the Mossy property, causing immediate settlement under the Mossy buildings. In Mr. Sherman's opinion, the dewatering was improperly done. He said everyone should have taken measures to minimize damage from the dewatering system. Sherman made reference to the Eustis Engineering report of August 10, 1992, provided to the Sewerage & Water Board and Pepper & Associates. On page 12 of the report it is stated that "prolonged pumping of the dewatering system may result in subsidence of adjacent areas."[2] The Eustis report warns the Sewerage & Water Board and Pepper as follows:
"Because of the type of construction required, the soil conditions at the site, and the proximity of the existing pump station and other facilities, there can be no guarantee that vertical and lateral movements will not occur due to vibrations, sheeting/bracing and dewatering. Therefore, Sewerage & Water Board of New Orleans should be made aware of the liability associated with the project before proceeding with construction."
Defendant's expert, Ralph Junius, a civil-structural engineer, was critical of the 1977 construction at the Mossy site. In his opinion the building was improperly built on spread footings and, as indicated *278 by the pre-construction photos, was attempting to relieve itself.
Richard Burr, a geotechnical expert, also testified for the defendants. In his opinion, soils under the Mossy property were pre-compressed. Therefore, dewatering operations should not have had a dramatic effect on the Mossy property. He testified that drawdown of the aquifer caused by the pumping took much longer than indicated by Mr. Sherman. Mr. Burr indicated there should have been a lag of several months before the effect of the pumping was felt, not the immediate effect as testified by Mr. Sherman.
But the earlier Eustis report had warned the Sewerage and Water Board of the existence of poor soil conditions that could have detrimental effects to the plaintiff, after construction began.
Another defense expert, Mr. William Gwyn, Civil Engineer, testified that dewatering caused a small amount of settlement. In his opinion the dewatering did not cause the damages found by Blessy and Sherman.
Considering all of these experts, we find that the plaintiff proved by a preponderance of the evidence that the damage to his property, in particular the deep well pumping at the construction site, constitutes an inverse condemnation.
The record reflects that Mossy suffered substantial financial losses due to the destruction of their show room and the delay of the construction project. The economic losses that Mossy sustained are clearly compensable under traditional inverse condemnation analysis. In State, Through Dept. of Transp. and Development v. Chambers Inv. Co. Inc., 595 So.2d 598 (La.1992), the Louisiana Supreme Court set out a three part test for claims involving "the taking and damaging of property rights." Id. at 603. In order to recover for inverse condemnation under the Chamber's test a plaintiff must show: 1) the plaintiff's claim involves a property right; 2) the plaintiff's property right was "taken or damaged in a constitutional sense;" and 3) the taking or damage was for a "public purpose."
In Chambers, the litigation arose out of the construction of an interstate highway. A large tract of land was expropriated including the entire 300-acre tract of land owned by the Chambers family. The family had considered developing the land for residential use. They abandoned this idea when they learned of the interstate plan. The construction was estimated to last for five years. The plaintiffs sought compensation for the land taken and the resulting severance damages for the taking of the land because their property effectively would be removed from development during the construction period. The plaintiffs lost their claim for past and future delays in residential development during highway construction. The Chambers court concluded that, where there is no allegation or evidence of personal injury or physical damage to property, a finding of liability under Article 667 "requires proof of the presence of some type of excessive or abusive conduct." Id. at 604.

DAMAGES
The defendants argue that the settlement at the Mossy site was due to poor soil condition. However, the Eustis report had warned them of the poor soil conditions at the site of the construction in their report of August 10, 1992. Yet, Pepper and Associates and the Sewerage Water Board, who had the ultimate authority to pick and choose the method of construction, elected to proceed with the construction plan. Pepper and Pittman were not responsible for choosing the method used to remove the subterraneous water. By law when they accepted the contract, they were required to follow the specifications demanded by the public entity. The Sewerage and Water Board demanded that they use the dewatering technique as opposed to surface pumping (sumping). This choice was made despite Pittmann's expert, Mr. Griffin, having recommended alternate methods, which posed less risk of *279 subsidence to neighboring structures. Limited sumping was employed on the project in order to remove surface water due to rainfall. However, damage to the plaintiff's property was caused by the more hazardous method utilized, in particular the deep well pumping. Although the deep well watering system employed was prudently done, it still caused the April 13, 1994, settlement at the Mossy site. Accordingly, we find the defendant strictly liable for the damages to Mossy. Under these facts and circumstances we agree with the trial court's finding the defendant 100% liable to the plaintiffs for damages sustained as a result of the actions of the Sewerage and Water Board. Accordingly, the Sewerage and Water Board is strictly liable for Mossy's damages.
Mossy has operated its family business at the same location for three generations. The business was personal to the Mossy family and was not a purely commercial enterprise. The defendants argue that the criteria laid out by Roman Catholic, Supra, is applicable only to purely non-commercial property. Such a rigid distinction is not made in Roman Catholic. In fact, the low-income housing property involved in that case was one that generated revenue for the archdiocese. In the instant case, Mr. Mossy is not a disinterested investor, but rather proprietor of a family owned business. "[U]nless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will in fact make the repairs, damages are measured only by the difference between the value of the property before and after the harm." Id. at 879-80. In the instant case the plaintiff has a personal reason and a specialized fact. They alone lost their grandfather status with General Motors; they alone had their building condemned by the city. The fact that the plaintiffs have a for-profit business, as is constantly mentioned by the defendant in their briefs, is irrelevant. A for-profit business deserves the same protection under the laws of this state as the non-profit businesses. The trial court properly ruled that the Sewerage and Water Board must compensate the owner for damages to his property. Just compensation requires that the property be restored to the condition it was in before the harm was done. The plaintiff could not repair the building to the pre-damage condition. In fact, the damage was so severe that the City's building inspector condemned the show room.
Additionally, the plaintiff had to comport with the new regulation imposed by General Motors, which they would otherwise not have had to because of being grandfathered in. When Mossy's building was condemned, General Motors had changed their requirements to approve new construction. The new more stringent requirements regarded not only the appearance, but the proximity and layout of new dealership buildings. Therefore, Mossy had no option but to construct a new separate showroom for the Pontiac showroom adjoining the new Oldsmobile showroom. Previously it had been located across the street. Mossy never claimed that its Pontiac showroom was demolished due to dewatering damage. Rather, the destruction of the Oldsmobile showroom and adjoining structures triggered the application of the General Motors requirements. To place the plaintiff back in his pre-damage situation and to follow the holding of Roman Catholic and its progeny, the only alternative was to rebuild and replace the prior existing edifices. Furthermore, the Building Code of New Orleans had changed since the renovations to the Mossy building in 1977. Due to the changes in the building code it was virtually impossible to restore literally the old structure.

SERVICE BUILDING
The service building brings additional concerns in light of Roman Catholic and the testimony of the experts. The judge awarded the plaintiff one million two hundred thousand dollars ($1,200.00.00) for the total reconstruction *280 of the service area. There is inadequate information in the record to justify this ruling. There was obvious damage to the plaintiff for which the defendant is responsible. Nevertheless, to replace totally/rebuild the service area would place the plaintiff in a better position than before the construction. This could be a windfall, which would inure to the detriment of the defendants because of the unqualified cost. As a general rule a plaintiff should be put in as good a position as before his property was damaged, but not a superior position. Lemon v. Fein, 467 So.2d 548 (La.App. 4th Cir.), writ denied, 472 So.2d 594 (La.1985).
Mr. Blessy, the plaintiff's expert admitted that he never stated that the service area had to be replaced or even repaired. Additionally Mr. Ken Meyn, an engineer retained by the plaintiff's attorney, stated that after his inspection of the service building in August of 1996, he determined the building's basic structural components were in generally good condition and were unaffected by the settlement. Mr. Blessy admitted that there was a settlement in the service area before April of 1994. In fact under cross-examination he admitted that during his calculations he failed to take into consideration the drainage grate which ran down the middle of the floor of the service area. In the record we have little documentation and testimony to support the damage and cost of the repairs for the service area.
The testimony concerning the cost of repairing the service area is that of Armand LeGardeur, plaintiffs construction cost expert who had done the repairs to the Mossy property in 1977-1978. He opined that if the service building had to be replaced, an estimated total replacement cost for the service building would be $1,280,000.00 based on a forty dollar per square foot in a thirty-two thousand square foot area. He qualified that this was based on a thirty to forty dollars per square foot basis to break out the slab, preserve the walls and roof, drive the pilings, raise the slab and twenty automotive lifts, and move electrical systems and sprinklers. On cross-examination neither the Board nor any of the other defendants asked any questions of Mr. LeGardeur; nor did the defendant offer any evidence of their own regarding the cost of repair to the service area or alternative methods of repair or damage valuations.
The Walker elevation survey of the Mossy property taken between May 5, 1994 and January 6, 1996 repeated elevation points at 180 points throughout the property. Points in the service area showed settlement similar to that sustained in public areas which were earlier condemned by the city. This survey indicated that settlement damage to the service area was of a progressive nature. Some settlement in the service area was even worse than in the body shop where the slab collapsed.
Mr. Vincent Sclafani, the service manager employed by Mossy for over 28 years, described the conditions in the service area after the dewatering began. He said that, as the settlement progressed, it was necessary continually to re-calibrate equipment throughout the service area. He described how the front-end rack sank 1¼ inches in one month. Additionally, the service entrance sinkage was causing mufflers to be taken off the cars of the customers. He estimated the settlements in 1994 were from one to three inches.
Sewerage and Water Board argues that Mossy is not entitled to recover for the service area because it has not actually conducted the repairs. However, Roman Catholic imposes no such requirement that tort victims can only recover for damages to their property that has been repaired before trial.
The lack of concrete evidence leaves little to support Mr. LeGardeur's estimates. The only factual evidence to support what actual damage was done to the service area were pictures of the service area, which reflect the significant damage to the walls and support beams in the roof. It appears from the allegations made by the *281 defendants in their briefs that the service area is to date in the same condition as it was at the time of the complained of damages. Therefore, we find insufficient information in the record to make a realistic determination on the cost to repair/restore Mossy's service area. Accordingly, we remand the matter for further hearings. The total award of four million two hundred and forty-seven thousand seven hundred and nineteen dollars ($4,247,719.00) to the plaintiffs is therefore reduced by 1.2 million dollars, the amount awarded by the trial court for the service area building.

LOSS OF BUSINESS
Lionel Batiste, Mossy's new car sales manager, testified that cracks began to appear in the walls and in the floors. Customers and employees began to complain. Soon thereafter fewer customers came because it appeared that Mossy was going out of business. In addition to the poor appearance, he also noticed that the construction caused a decline in sales. Customers that did come complained about long lines of traffic. Based on sales records, Mossy had lost 150 potential customers and had suffered a loss of between twenty and thirty new car sales each month. This in turn caused loss in the service department and fewer used car sales based on trade-ins.
Mr. Roger Bacon, Mossy's general manager who had worked for the company for over 24 years, testified it became harder to attract new car salesmen because of the lack of customers. This was exacerbated by having to conduct business in trailers.
Mr. William Legier, Mossy's accounting expert, qualified that the financial impact to Mossy was over six million dollars. The Board argues that in Chambers, in order to recover economic damages caused by construction and traffic disruption under inverse condemnation, a plaintiff must show some "abusive or excessive conduct" by the defendants. On the contrary, the Court in Chambers, made clear that "abusive or excessive conduct"requirements apply only in cases where there is no allegation or evidence of physical damage to property:
We are not prepared to say that, in all cases, an owner must prove an abuse of right of ownership before he may suppress or recover for a violation of Article 667 by a neighbor. But we think that in a case, such as the present one, in which there is no allegation or evidence of personal injury or physical damage to property, it is consistent with the principal of the Civil Code and our jurisprudence to require proof of the presence of some type of excessive or abusive conduct to hold a landowner responsible under Article 667.
Chambers, 595 So.2d 598, at 604.
Unlike the plaintiff in Chambers, Mossy suffered particularized damages, including economic losses directly related to the destruction of its showrooms and offices, as well as those flowing from construction delays. Mossy experienced traffic cut-offs and diversions that resulted in impossible ingress and egress to their establishment. Its building became condemned by the city and was inoperable and was subjected to new stringent City building codes. Qualified salesmen were lost to other businesses from lack of sufficient business to warrant their employ. The service department suffered from the trickle down effect culminating in an insufficient number of new cars being purchased and fewer trade-in cars being available to service.
Finally, faced with losing its advantageous contract with General Motors, Mossy had no choice but to replace its existing buildings in order to retain the contract. This requirement would never have been imposed on Mossy because its old buildings were grand-fathered in by General Motors. However once new construction became necessary, Mossy was subject to General Motors's new building requirements. The Board's actions substantially interfered with Mossy's business resulting in a taking or damage in a constitutional *282 sense. This is not a mere inconvenience, but a specialized injury specific to Mossy; consequently, they are entitled to compensation for these injuries.

SOIL DECONTAMINATION
The trial court found the defendant's actions concerning the soil decontamination grossly negligent. We disagree in part. We agree that the defendant knew the delays were inevitable. The Sewerage and Water Board received an estimated cost of five million dollars ($5,000,000.00) for the soil cleanup. They knew delays would occur because the LDEQ required the cleanup prior to the construction beginning. Nevertheless, the Board went forward with the contracts and the construction project. Although, the defendant's expert, Mr. Meyers, testified that there were delays, he opined that the decontamination removal procedure was a justifiable delay. The defendants attempt to deny liability to the plaintiff for damages they knew were probable and anticipated. They were aware as early as 1992 in the Eustis Report that the soil conditions were poor and could not withstand the construction without collateral damage to Mossy.
The defendants attempt to characterize the decontamination project and the dewatering technique as two separate and distinct issues, but when aggregated and including the defendant's behavior as a whole, there results an inevitable damage to the plaintiff. The culpability rests with the defendant, the Sewerage and Water Board. That is the very reason for laws governing expropriation and inverse condemnation.
Additionally, Mossy presented evidence regarding the expenses resulting from damages incurred as a result of the construction of a new pumping station that consisted of: 1) trailer rental and moving expenses that Mossy incurred when it was forced to operate out of temporary facilities; 2) the cost of demolishing and replacing its showroom and offices in accord with new building codes and requirements imposed on Mossy by General Motors; and 3) the cost to repair settlement damage to Mossy's service area.
The plaintiff's additionally claim that the Board was responsible for the delay in the completion of the construction project. Extended interruptions had a devastating financial effect on Mossy. Mossy's business was severely impacted by the turmoil resulting from escalating property damage during the construction project. Mossy's expert accountant, Mr. Legier, quantified the financial impact on Mossy's business at over $6 million. Directly adverse to this opinion, the Board's expert, opined that Mossy had experienced no damage whatsoever as a result of either the loss of its showroom or the excessive constructive delays. Therefore, given the arguments and facts present before the trial court and the jurors, we agree with their determinations that there was substantial economic loss sustained by Mossy. After considering the entire record and the evidence presented at the trial on the merits, an award of one million dollars is both adequate and appropriate. Accordingly, we award the plaintiff Mossy one million dollars for economically sustained losses.

ATTORNEY FEES
The trial court based the attorney's fees on 1) Mossy's total recovery (both property damages and economic losses) against the Board and 2) the prejudgment interest awarded, the sum of which represents the reasonable attorney's fees that Mossy incurred. Pursuant to La. R.S. 13:5111:
A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as part of the costs of court, such *283 sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding. Any settlement of such claim, not reduced to judgment, shall include such reasonable attorney, engineering, and appraisal fees as are actually incurred because of such proceeding. Actions for compensation for property taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking.
Regardless of language of statutory authorization for an award of attorney fees or the method employed by a trial court in making an award of attorney fees, courts may inquire as to the reasonableness of attorney fees as part of their prevailing inherent authority to regulate the practice of law. Rivet v. State, Dept. of Transp. and Development, 96-0145 (La.9/5/96), 680 So.2d 1154.
The trial court's award of attorney fees is erroneous as it awards attorney fees of only twenty-five percent of the judgment. This case was quite complicated and undoubtedly required much time, effort, and skill on the part of the plaintiff's attorneys. The record before us lacks evidence to substantiate the amount of time actually expended to make a decision on what amount of attorneys fees should be awarded. The defendant has been deprived of his opportunity to have adequate discovery with regard to the experts' fees for reimbursements related to the trial. We therefore vacate the award of attorney fees and remand the matter to the trial court to take additional evidence as to the attorney fees actually incurred and assess and fix attorney fees in accordance with La. R.S. 13:5111 and factors enunciated herein.

CROSS CLAIM DISMISSAL
The trial court dismissed the Sewerage and Water Board's cross claim against Pittman Construction and Pepper and Associates. All parties had agreed that the cross claim would be tried after the trial. During the course of litigation the Board filed cross claims against C.R. Pittman and Pepper and Associates. The Board's cross claim alleged Pittman was contractually bound to indemnify the Board for Pittman's negligence. Prior to the trial, the parties agreed to submit for adjudication by the court (rather than the jury), all indemnity issues based on the evidence submitted at trial and the applicable law. In keeping with this agreement, Pittman, Pepper and the Board understood that the court would decide the indemnity issues at the conclusion of the case after the jury had rendered its verdict. Approximately one month after the trial, the judge rendered a judgment against the Board and dismissed the cross claims and denied the Board's claim for indemnity from Pittman and Pepper. There is nothing in the record to indicate that the parties expected to have a separate trial on the cross claims. The judge obtained all of the necessary information needed during the course of the four-week trial and was thoroughly familiar with the facts and the law surrounding the indemnity issues. The trial court made a well-founded decision to dismiss the cross claims, based on the law and the evidence presented at the trial.
Assuming arguendo that the trial court did err by dismissing the Board's cross claims without a separate hearing, the Board did not suffer any prejudice. La. R.S. 38:2216(G) clearly forbids a public entity such as the Board from requiring a contractor to provide indemnity for the public entities' own negligence or strict liability:
It is hereby declared that any provision contained in a public contract, other than a contract of insurance, providing for a hold harmless or indemnity agreement, or both,
1) From the contractor to the public body for damages arising out of injuries or property damage to third parties *284 caused by the negligence of public body, its employees, or agents, or
2) From the contractor to any architect, landscape architect, engineer, or land surveyor engaged by the public body for such damages caused by the negligence of such architect, landscape architect, engineer, or land surveyor is contrary to public policy of the state, and any and all such contract are null and void.
Louisiana law also clearly provides that a contractor cannot be required to indemnify an owner when the owner's liability is based on La.C.C. art. 667.
[I]t is the public policy of the state that the responsibility which may be imposed on [a]contractor under art. 667 of the Louisiana Civil Code shall be limited solely to the obligation of such...contractor...to act as to that of a surety of the owner. Nothing in this section shall be construed to relieve a contractor of any liability, which he may incur as a result of his own negligence or the improper performance of the work performed under the construction contract. La. R.S. 9:2773.
Two geotechnical engineers called as expert witnesses established that responsibility for damages for dewatering was the Board's. The Board should have either required a proper dewatering system, which would have provided a positive cutoff of the excavation (which was impossible since the Board required that the pumping station remain operable at all times), or the Board should have accepted responsibility for the consequences of the dewatering to neighboring properties. It was only at the insistence of the Board that the dewatering system be used as opposed to other alternatives. Plaintiff's structural engineer, Mr. Blessy, confirmed that the contractor must act in accordance with plans and specifications pursuant to La. R.S. 9:2771. Therefore, Pitmann cannot be required to indemnify the Board for the Board's own negligence or strict liability.
In the instant case, the Board's fault was determined by the trial court to be 100% based on theories of strict liability, inverse condemnation and gross negligence. The Board did not dispute that Pepper was its agent. Thus, any gross negligence on the part of Pepper is imputed to the Board.
Assuming arguendo that the indemnity provision in the contract between Pittman and the Board was for damages arising from Pittman's own negligence, the Louisiana statutes cited above supercede and no indemnification to the Sewerage and Water Board is possible. Therefore, we find no reason for the trial court to be reversed on the dismissal of the Sewerage and Water Board's cross-claims against either Pepper or Associates or Pittman Construction. Accordingly, the trial court's dismissal of the cross-claims is affirmed.

MENTAL ANGUISH AWARD
The appellants contest the trial court's dismissal of Roy Mossy, Sr.'s claim for mental anguish against the Sewerage and Water Board. The jury had awarded Mr. Mossy two hundred and fifty thousand dollars ($250,000.00), for his mental anguish claim; however, the trial court dismissed the claim.
It is well established in Louisiana jurisprudence that recovery for mental anguish/emotional distress from property damage is possible even without actual physical injury or a manifestation of the physical injury. Our Court in Gaynor v. State Farm Mut. Auto. Ins. Co., 98-CA-1374 (La.App. 4 Cir. 2/10/99), 727 So.2d 1279, (citing Blache v. Jones, 521 So.2d 530 (La.App. 4th Cir.1988)), citing a long line of Louisiana jurisprudence, identified the four situations when a mental anguish award can result from property damage. The situations are:
(1) When property is damaged by an intentional or an illegal act;
(2) When property is damaged by an act for which the tortfeasor will be strictly liable or absolutely liable;

*285 (3) When property is damaged by acts constituting a continuing nuisance;
(4) When property is damaged at a time in which the owner thereof is present or situated nearby and the owner experiences trauma as a result.
In the instant case the plaintiff Roy Mossy Sr., failed to provide any documented trauma, which arose out of the loss of his property. The facts of this case adequately distinguish those cases that awarded compensation for mental anguish, pain and suffering resulting for the loss of property. There are many factors to consider in determining the degree of mental stress suffered and whether the degree of stress engendered by the circumstances were beyond that which a reasonable person may expect to cope. The trial court was in the best position to witness and synthesize the materials presented in a trial on the merits.
We agree with the trial court that the plaintiff has failed to establish his burden of proof for this claim. We can find no plausible evidence in the record to support it.

CONCLUSION
We find that the Sewerage and Water Board is strictly liable for the damages sustained by the plaintiff and affirm the judgment in favor of the plaintiff and against the Sewerage and Water Board for two million, and forty seven thousand seven hundred and nineteen dollars ($2,047,719.00) for out of pocket expenses due to construction and one million dollars ($1,000,000.00) for business loss and interruption. We also affirm the trial court's dismissal of the cross claims and Mr.Mossy's claim for mental anguish. We vacate the amount awarded for the service area, one million two hundred thousand ($1,200,000.00) and remand for further determination on the issue of replacement/repair cost for the service area building as well as the issue of court cost and attorney's fees.
AFFIRMED IN PART, VACATED IN PART AND REMANDED.
LANDRIEU, J. concurs in part and dissents in part.
LANDRIEU, J. concurring in part and dissenting in part.
I concur in part and respectfully dissent in part.
The majority is correct when it remands the matter for a calculation of reasonable attorney fees and a reassessment of the loss caused by the damage to the plaintiffs' service building.
Considering the matter de novo, I do not find that the damage to the plaintiffs' showroom and service building caused by the dewatering process was a constitutional taking for which attorney fees are due under La.Rev.Stat. 13:5111, although the Sewerage & Water Board is liable for the damage it caused under the theory of strict liability.
In addition, I believe the majority misapplies Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993), in the amount of damages awarded for plaintiffs' loss of their showroom. "[C]ompensation...to the full extent of...loss" does not mean that plaintiffs are entitled to the cost of constructing a new facility irrespective of the size and quality of the new construction. While it would be unjust to plaintiffs to award only the depreciated value of the showroom, it is likewise unjust to require the defendant to pay for completely-new and upgraded facilities built on pilings, particularly where the destroyed showroom was built on spread footings rather than on pilings and the poor foundation was partly responsible for the settlement that necessitated the abandonment of the structure. In short, the award of $2,047,719 for "out of pocket expenses due to construction" is excessive.
NOTES
[1] La. C.C. art. 667, a strict liability article, was amended by Acts 1996, 1st Ex.Sess., No. 1 sec. 1, effective April 16, 1996, limiting ultrahazardous activities to pile driving or blasting with explosives. This is a substantive change in the law and cannot be retroactively applied.
[2] Previously there were other plaintiffs that experienced the same settlement problems. They ultimately settled out of court with insurance companies: Dooley's Lounge, Meyer's Auto Parts and Broadmore Animal Hospital.